30 F.Supp.2d 1175 (1998)
Brandon BEUSSINK, by and through his parent and next friend, Nadean Beussink, Plaintiff,
v.
WOODLAND R-IV SCHOOL DISTRICT, Defendant.
No. 1:98CV00093 RWS.
United States District Court, E.D. Missouri, Southeastern Division.
December 28, 1998.
*1176 *1177 Stephen M. Ryals, Ryals and Soffer, P.C., Clayton, Mo, for Plaintiff.
Kenneth C. McManaman, O'Loughlin and O'Loughlin, Cape Girardeau, MO, for Defendant.

MEMORANDUM AND ORDER
SIPPEL, District Judge.
This matter is before the Court on plaintiff's request for a preliminary injunction. A hearing on the request for a preliminary injunction was held on October 8, 1998.
Plaintiff, Brandon Beussink ("Beussink"), claims that the Woodland R-IV School District ("the Woodland School District") violated his rights under the First Amendment to the United States Constitution. Specifically, Beussink claims that the Woodland School District suspended him from school for ten days because he had posted a homepage on the Internet which was critical of Woodland High School. The homepage's criticism of the high school included crude and vulgar language.
The evidence presented at the hearing satisfies the standard for granting preliminary injunctive relief in Beussink's favor. The request for a preliminary injunction will be granted.

Factual Background
There was a significant amount of conflicting testimony at the preliminary injunction hearing. Most of the conflicting testimony, however, is irrelevant to the issue to be decided by the Court.
Beussink is currently enrolled in the twelfth grade at Woodland High School. At the time of the events in the Complaint, he was a junior at the school.

Beussink's Homepage Posted on the Internet
In early February 1998 Beussink created a homepage, which he posted on the Internet. The information in the homepage could be accessed by other Internet users.
There is no evidence that Beussink used school facilities or school resources to create his homepage. The homepage was created at home on Beussink's own computer. The homepage was not created during school hours. Beussink created the homepage using a program which he found on the Internet.
Beussink's homepage was highly critical of the administration at Woodland High School. Beussink used vulgar language to convey his opinion regarding the teachers, the principal and the school's own homepage. Beussink's homepage also invited readers to contact the school principal and communicate their opinions regarding Woodland High School. Beussink's homepage also contained a hyper-link that allowed a reader to access the school's homepage from Beussink's homepage.[1]
Beussink testified that he did not intend the homepage to be accessed or viewed at Woodland High School. He just wanted to voice his opinion. There was no evidence presented at the hearing indicating that the homepage was accessed at Woodland High School prior to the events of February 17, 1998.

A Student Views Beussink's Homepage at School
Prior to February 17, 1998 Beussink allowed a friend, Amanda Brown, to use his home computer. While using Beussink's home computer, Ms. Brown saw Beussink's homepage. Ms. Brown testified that sometime after she first viewed Beussink's homepage, she had an argument with Beussink. Ms. Brown testified that she wanted to retaliate *1178 against Beussink because she was angry with him. On February 17, 1998 Amanda Brown, purposefully accessed Beussink's homepage during the second hour of school and showed it to Delma Ferrell, the computer teacher at Woodland High School.
Beussink was not with Brown when she accessed his homepage. Brown testified that she did not access the homepage at Beussink's request, with his authorization, or even with his knowledge. Beussink had not given the Internet address of his homepage to Amanda Brown.
At the time Brown accessed the homepage and showed it to Ms. Ferrell, there was only one other student in the room. That student did not view the screen and there was no evidence of a disturbance.

The School's Principal Decides to Discipline Beussink Because of the Homepage
Ms. Ferrell was upset by what she read on Beussink's homepage. Ms. Ferrell went directly to the school office to inform the principal, Mr. Yancy Poorman. Principal Poorman returned to the computer lab with Ms. Ferrell and viewed the homepage. Principal Poorman testified at the preliminary hearing that he and Ms. Ferrell were upset by the homepage. Principal Poorman further testified that he did not know at that time what the exact nature of the disciplinary measure would be, but he made the decision to discipline Beussink immediately upon viewing the homepage. Principal Poorman decided to discipline Beussink because he was upset that the homepage's message had been displayed in one of his classrooms.[2] Principal Poorman made the decision to discipline Beussink before he knew whether any other students had seen or even had knowledge of the homepage.
Specifically, Poorman testified as follows:
Q. Now, Mrs. Ferrell, when she came to you, was upset and angry, is that accurate?
A. I couldn't discern anger, but upset, yes.
Q. Did you discern that she was offended?
A. Yes, sir, I believed her to be.
Q. Would you agree with my characterization that she was very upset and offended?
A. Yes, sir.
Q. She was speaking to you rapidly?
A. Yes, sir.
Q. Quite obviously agitated over this home page, is that right?
A. Yes, sir.
Q. And you were, as well, when you saw it?
A. When I viewed it and it was explained that it had been seen by other students, yes, sir, I was upset.
Q. When you saw this homepage, Exhibit 1, at that moment you decided that you were going to discipline Brandon, is that accurate?
A. That there would be some discipline taken, yes sir.
Q. You spoke to no students prior to making that decision, is that correct?
A. To the best of my recollection, no, sir, I did not.
Transcript of Preliminary Injunction Hearing at page 29-30.

Beussink's Homepage is Seen by Other Students; Classes are not Materially or Substantially Disrupted
It is not clear how many times Beussink's homepage was seen at Woodland High School on that day. The testimony at the hearing indicated that Beussink's homepage was accessed as many as two other times that day.
The school librarian, testified that Beussink accessed the homepage in the library during second hour. The librarian testified that she and Amanda Brown were present when Beussink accessed the homepage. Beussink denied accessing the homepage. Brown also denied the events described by Ms. Schlief.[3] Regardless, there was no evidence that Beussink showed the homepage to *1179 other students. Nor is there any evidence that there was a disturbance in the library on February 17, 1998.
Two class periods later, the computer teacher, Ms. Ferrell, apparently allowed some of the students in her fourth hour class to access the homepage. There is no evidence that Beussink was present in the classroom when this took place. There is no evidence that Beussink instigated the contact with his homepage in Ms. Ferrell's fourth hour class.
Ms. Ferrell testified that three of the students had located the homepage. Ms. Ferrell testified that the students accessed Beussink's homepage after she granted them permission to do so. Ms. Ferrell discussed the homepage with the students. Another group of students also found the homepage. Ms. Ferrell told them to exit the page. The students followed Ms. Ferrell's instructions. Ms. Ferrell was not aware of any other disruption to her classroom that day.

Beussink is Disciplined Because of His Homepage on the Internet
Principal Poorman issued the first disciplinary notice to Beussink during the fourth period. This disciplinary notice suspended Beussink from school for five days. The notice was delivered to Beussink in Mr. Bristow's class. Mr. Bristow testified that the only disruption in his classroom occurred when the disciplinary notice was delivered. Mr. Bristow testified that delivery of a disciplinary notice always caused disruption to his classes. Mr. Bristow also testified that Beussink approached Mr. Bristow and offered to give him the address for the homepage so he could look at it. Mr. Bristow declined the offer and class continued.
Later that day Principal Poorman reconsidered the initial disciplinary notice. Specifically, Principal Poorman reconsidered the length of Beussink's suspension. Principal Poorman issued a second disciplinary notice increasing Beussink's suspension period from 5 to 10 days. This second notice was delivered to Beussink during seventh hour in Ms. Talbut's classroom. Ms. Talbut indicated that the only disruption in her classroom that day was the result of the delivery of the disciplinary notice. Ms. Talbut, like Mr. Bristow, testified that delivery of a disciplinary notice is always disruptive. Beussink approached Ms. Talbut, who taught civics, with a hard copy of the first page of his homepage. Beussink asked Ms. Talbut if the school could discipline him for what he had written. Ms. Talbut testified that she told Beussink she did not know.
There is conflicting testimony regarding the origin of the hard copy that Beussink allegedly showed to Ms. Talbut. Beussink testified that the hard copy was attached to the second disciplinary notice. The school secretary Ms. Johnson, indicated that nothing was attached to the notice when she delivered it. Regardless of the hardcopy's origin, there is no evidence any students saw the hard copy. There is no evidence that the document's presence in Ms. Talbut's room seventh hour caused a disturbance in the classroom.
Beussink went to the school office to speak with Principal Poorman shortly after he received the second disciplinary notice. Principal Poorman did not reconsider the 10 day suspension. At this meeting, Principal Poorman told Beussink to "clean up" his home page or "clear it out". After meeting with the Principal Poorman, Beussink returned to Ms. Talbut's classroom.
When he arrived home at the end of the school day, Beussink removed his homepage from the Internet. Beussink served the 10 day suspension. He returned to school after the suspension. Beussink has not reposted the homepage.

Beussink's Suspension Affects His Final Grades for the Semester
The Woodland School District has an absenteeism policy which "drops" students' grades in each class by one letter grade for each unexcused absence in excess of ten days. Suspension days are considered unexcused absences. At the time of the suspension, Beussink had already accumulated 8.5 days of unexcused absence. The additional 10 days of suspension increased his number of unexcused absences to 18.5. Application of the absenteeism policy dropped Beussink's grades 8.5 grade levels.
Before applying the absenteeism policy, Beussink was failing two of his classes and *1180 passing four classes. Application of the absenteeism policy resulted in Beussink failing all of the classes in which he was enrolled for the second semester of his junior year.

Analysis

I. Legal Standard
When determining whether to grant preliminary injunctive relief, the Court considers the following:
1. the threat of irreparable harm to the movant (Beussink) if the relief is not granted;
2. the balance between this harm and the harm to the non-movant (the Woodland School District) if the injunction is granted;
3. the movant's likelihood of success on the merits; and
4. the public interest.
Dataphase Sys., Inc. v. C.L.Sys., Inc., 640 F.2d 109, 113 (8th Cir.1981).

II. The Propriety of Granting Injunctive Relief.

A. Likelihood of success on the merits.
The evidence presented at the preliminary injunction hearing supports a finding that Beussink is likely to succeed on the merits of his claim.
The United States Supreme Court has made it clear that students do not shed their First Amendment rights at the schoolhouse gate. Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). It is equally clear, however, that a student's right to free speech is not without limitation. Id. at 509, 89 S.Ct. 733. Schools may limit student speech. Id. But, any limitation on student speech is permissible only in narrowly defined circumstances. Id.
In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would `materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition can not be sustained.
Id. at 509, 89 S.Ct. 733 (emphasis added).
While speech may be limited based upon a fear or projection of such disruption, that fear must be "reasonable" and not an "undifferentiated fear" of a disturbance. Id. at 508-09, 89 S.Ct. 733.[4]
Principal Poorman testified at the preliminary injunction hearing that he made the determination to discipline Beussink immediately upon seeing the homepage. He was upset that the message had found its way into his school's classrooms. Principal Poorman's testimony does not indicate that he disciplined Beussink based on a fear of disruption or interference with school discipline (reasonable or otherwise.) Principal Poorman's own testimony indicates he disciplined Beussink because he was upset by the content of the homepage.
Disliking or being upset by the content of a student's speech is not an acceptable justification for limiting student speech under Tinker.
Beussink has demonstrated a likelihood of success on the merits of his First Amendment claim.

B. Threat of irreparable harm
Irreparable harm is established any time a movant's First Amendment rights are violated. Marcus v. Iowa Pub. Television, 97 F.3d 1137, 1140-41 (8th Cir.1996). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)(plurality opinion). As *1181 discussed above, it is likely that Beussink will be able to prove that his First Amendment rights were violated when he was disciplined by the Woodland School District. Additionally, Principal Poorman directed Beussink to "clean up" his homepage or remove it from the Internet. Beussink followed Principal Poorman's direction. As a result, any violation of Beussink's First Amendment rights is continuing.
Beussink also faces academic harm. Beussink's grades were dropped one grade level for each day his number of unexcused absences exceeded ten. The testimony at trial indicated that this resulted in Beussink failing four classes that he would not otherwise have failed. Beussink is currently a senior. The loss of these credits will potentially delay Beussink's graduation with his class at the end of this school year.

C. Balance of the threat of Irreparable Harm to Beussink if injunctive relief is not granted with that to the school if it is granted.
The potential harm to Beussink if injunctive relief is not granted outweighs the potential of harm to the school if it is granted.
Beussink's First Amendment rights and his academic standing are at issue here. If the threat of discipline remains Beussink will be denied the opportunity to exercise his constitutional right to engage in that speech. Additionally, Beussink faces the further threat of not graduating with his class at the end of the school year.
The harm that the Woodland School District faces is not as apparent. It was clear from the testimony at the preliminary injunction hearing that even though several students saw the homepage, no significant disruption to school discipline occurred. Principal Poorman testified that even though he heard students discussing the incident in the halls, there was no disruption caused by the discussions.
On the other hand, there was also testimony at the preliminary injunction hearing that this was not first incident involving Beussink. Beussink had previously been disciplined for inappropriate use of the school computers at Woodland High School. In an incident unrelated to the events of February 17, 1998, Beussink had apparently been violent and disrespectful to the school librarian. As a result of this unrelated conduct, Beussink had been banned from using the school's computers in the library.
The Court is sympathetic to the necessity of instilling and maintaining discipline and respect for teachers in high school classrooms. Beussink's unrelated improper conduct may have justified a more severe kind of discipline than Beussink received at that time, including even suspension. That unrelated conduct may also explain Principal Poorman's reaction to Beussink's homepage. But the issue before this Court is not Beussink's unrelated improper conduct. Beussink was not disciplined on February 17, 1998 because he was disrespectful or disruptive in the classroom. Beussink was disciplined because he expressed an opinion on the Internet which upset Principal Poorman and Ms. Ferrell.
Beussink's homepage did not materially and substantially interfere with school discipline. Further, there was no evidence to support a particularized reasonable fear of such interference. Beussink was disciplined for engaging in speech that this Court believes may be constitutionally protected speech.
The harm to Beussink if the injunction is not granted outweighs the harm to the Woodland School District if it is granted.

D. Public Interest
The public interest is served by granting Beussink injunctive relief because the public's interest is best served by wide dissemination of ideas.
As discussed above, it is likely that Beussink can show that his First Amendment rights are being violated. At first blush it may seem that the public's interest in orderly schools is best served by allowing the Woodland School District to discipline Beussink in whatever manner the school district deems appropriate. Further inquiry into the purpose of the First Amendment however, shows otherwise.
One of the core functions of free speech is to invite dispute. "It may indeed best serve its high purpose when it induces a *1182 condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging."
Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949).
Indeed, it is provocative and challenging speech, like Beussink's, which is most in need of the protections of the First Amendment. Popular speech is not likely to provoke censure. It is unpopular speech that invites censure. It is unpopular speech which needs the protection of the First Amendment. The First Amendment was designed for this very purpose.
Speech within the school that substantially interferes with school discipline may be limited. Individual student speech which is unpopular but does not substantially interfere with school discipline is entitled to protection.
The public interest is not only served by allowing Beussink's message to be free from censure, but also by giving the students at Woodland High School this opportunity to see the protections of the United States Constitution and the Bill of Rights at work.

III. Conclusion
When placed in the context of the four Dataphase factors, the evidence presented at the preliminary injunction hearing weighs in favor of issuing the preliminary injunctive relief sought by Beussink. Woodland School District will be enjoined from using the ten day suspension in its application of its absenteeism policy to Beussink's grades for the second semester of his junior year. Further the Woodland School District will be enjoined from enforcing any other sanction arising from Beussink's homepage which is the subject of this lawsuit. Finally, the Woodland School District will be enjoined from restricting Beussink's use of his home computer to repost that homepage.
Accordingly,
IT IS HEREBY ORDERED that plaintiff's request for preliminary injunctive relief is GRANTED. Defendant is hereby enjoined from using the ten day suspension, which is the subject of this lawsuit, in its application of the school's absenteeism policy to Beussink's grades for the second semester of Beussink's junior year. Further the Woodland School District will be enjoined from enforcing any other sanction arising from Beussink's homepage, which is the subject of this lawsuit. Finally, the Woodland School District is enjoined from restricting Beussink's use of his home computer to repost that homepage.
NOTES
[1] It is important to note that while the hyper-link allowed the school's homepage to be accessed from Beussink's homepage, there was not a corresponding hyper-link allowing a user to access Beussink's homepage from the school's homepage.
[2] Poorman alone is responsible for determining the discipline that will be meted out at Woodland High School. He issues approximately 1600 disciplines a year, averaging 10 per day.
[3] This is the same class period during which Brown testified she was in Ms. Ferrell's classroom.
[4] The United States Supreme Court has recognized that First Amendment protection differs depending on the nature of the speech involved. When the speech at issue is sponsored by the school, the degree of protection it enjoys is governed by the standard set out in. Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 270-71, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Students' personal expressions which happen to take place on school property are different from school sponsored speech and continue to be governed by the standard set forth in Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).