J.S., a Minor By and Through his
Parents and Natural Guardians,
H.S. and I.S., Appellants,

v.

BETHLEHEM AREA SCHOOL
DISTRICT.

Commonwealth Court of Pennsylvania.

Argued April 10, 2000.
Decided July 14, 2000.
Reargument Denied Sept. 7, 2000.

Robert E. Sletvold, Easton, for appellants.

Jeffrey T. Tucker, New Britain, for appellee.

Before FRIEDMAN, J., FLAHERTY, J. and JIULIANTE, Senior Judge

JIULIANTE, Senior Judge.

J.S. (Student), a minor by and through his parents and natural guardians, H.S. and I.S. (Parents) (collectively, Appellants), appeal from the July 23, 1999 order of the Court of Common Pleas of Northampton County (trial court) that affirmed the decision of the Bethlehem Area School District (School District) to permanently expel J.S. from its schools. For the reasons that follow, we affirm.

In May of 1998, Student was in the eighth grade at Nitschmann Middle School, which is located within the School District. Sometime prior to May, Student created a web-site on his home computer and on his own time. The web-site, titled "Teacher Sux," consisted of several web pages that made derogatory comments about Student's algebra teacher, Mrs. Fulmer, and Nitschmann Principal, Mr. Kartsotis.[1]

Prior to accessing the web-site, a visitor had to agree to a disclaimer. The disclaimer indicated, *inter alia,* that the visitor was not a member of the School District's faculty or administration and that the visitor did not intend to disclose the identity of the web-site creator or intend to cause trouble for that individual.

Through an anonymous e-mail, a Nitschmann instructor learned of the web-site and promptly reported it to Mr. Kartsotis, who proceeded to view portions of the site.

1. The web-site also made derogatory comments about another teacher, Mrs. Spaihts. However, the School District did not pursue disciplinary proceedings against Student for the comments relating to Mrs. Spaihts.

2. The record is not clear as to when the local police and the FBI initiated and concluded their investigations. It is clear, however, that

Mr. Kartsotis then convened a faculty meeting and informed it that there was a problem in the school, but he did not disclose the nature of it.

Mr. Kartsotis contacted the local police authorities. The Federal Bureau of Investigation (FBI) was also contacted. Both agencies conducted investigations into the matter and were able to identify Student as the creator of the web-site.[2] During the investigations, Student continued to attend classes and participate in extracurricular activities. Student voluntarily removed the web-site approximately one week after Mr. Kartsotis became aware of it.

On or about July 30, 1998, the School District sent Appellants a letter articulating its intent to suspend Student for a period of three days. The letter alleged that Student violated School District policy through three Level III offenses:[3] threat to a teacher, harassment of a teacher and principal and, disrespect to a teacher and principal. After a hearing on the suspension, the School District opted to extend the suspension period to ten days, effective the beginning of the 1998–99 school year. Shortly thereafter, the School District commenced expulsion proceedings against Student.

Expulsion hearings were conducted on August 19 and 26, 1998. By that time, however, Parents had enrolled Student in an out-of-state school for the 1998–99 school year and thus, Student was unable to attend the August 26, 1998 hearing.

On August 31, 1998, the School District issued the following Findings of Fact, in relevant part:

both agencies declined to press any charges against Student.

3. As the School District's Code of Conduct is not a part of the record in this matter, we are unable to elucidate the levels of offenses provided for in the Code of Conduct.

1. [Student] was an eighth grade student at Nitschmann Middle School during the 1997–98 school year.

2. A. Thomas Kartsotis was the principal at the Nitschmann Middle School for 15 years and served in that capacity during the 1997–98 school year.

3. Kathleen Fulmer has taught for 26 years and was a mathematics teacher at Nitschmann Middle School during the 1997–98 school year.

4. [Student] was a student in Ms. [sic, Mrs.] Fulmer's Algebra I class during the 1997–98 school year.

5. [Student] informed a fellow student that he created a Website known as "Teacher Sux."

. . .

8. On a band trip, [Student] stated to [another student] that he was "taking down" the Web page.

9. There was no password required to access the Website and although a "disclaimer" appears (A2, p. 4), the custom on the Internet is to ignore disclaimers.

10. The Website was not "password protected" and could be found by "links" – there was access from other sites.

11. Within the Website was a Web page with the greeting "Welcome to Kartsotis Sux!" (A–2, p. 39)

12. Another Web page titled "Why Does Kartsotis Suck?" states, in pertinent part:

"5. He sees Mrs. Derrico (Asa Packer principal).[4]

6. He sees Mrs. Derrico naked.

7. He fucks Mrs. Derrico." (A–2, p. 41)

. . .

14. The Website caused Mr. Kartsotis embarrassment to himself and his family as well as stress.

. . .

16. The reference to Mrs. Fulmer states, in pertinent part: "Why Fulmer Should be Fired". (A–2, p. 25)

17. The Web page goes on to state:

"5. She shows off her fat fucking legs.

11. The fat fuck smokes.

12. She's a bitch!" (A2, p. 25)

18. The Web page regarding Mrs. Fulmer goes on to state:

"Why Should She Die?".

(Take a look at the diagram and the reasons I gave, then give me $20.00 to help pay for the hitman.)

Some words from the Writer:

Fuck you Mrs. Fulmer. You are a Bitch. You are a Stupid Bitch." (listed 136 times) (A2, pp. 26–28, inclusive)

19. Another Web page has a diagram of Mrs. Fulmer with her head cut off and blood dripping from her neck. (A2, p. 18)

20. Upon viewing the Fulmer site on May 12 or 13, 1998, Mr. Kartsotis immediately informed Mrs. Fulmer because he took the threats seriously.

. . .

22. After viewing the Web page, [Mrs. Fulmer] was frightened, fearing someone would try to kill her.

23. Mrs. Fulmer has had lasting effects from viewing the Web page, including stress, anxiety, loss of appetite, loss of sleep, loss of weight, and a general sense of lost well-being.

24. Mrs. Fulmer's lifestyle has changed dramatically as a result of the viewing of the Website, including short time [sic] memory loss and an inability to go out of the house and mingle with crowds.

25. Mrs. Fulmer has suffered headaches, takes Zanac as an anti-anxiety/anti-depressant, and was unable to return to school at the end of the year.

26. Mrs. Fulmer has applied for a medical sabbatical leave for the 1998–99

**4.** Asa Packer is another school within the School District.

school year because of her inability to return to teaching.

27. The Website had a demoralizing impact on the school community.

28. Mr. Kartsotis stated that the effect on Nitschmann Middle School caused the school to be at a low point which was worse than anything he had encountered in his forty (40) years of education.

29. The effect on the staff at Nitschmann Middle School was comparable to the effect on the school community for the death of a student or staff member because there was a feeling of helplessness and a plummeting morale.

30. The Website was viewed not only by staff members, but other students.

31. As a result of Mrs. Fulmer's inability to return to the classroom, substitutes were utilized which disrupted the educational process of the students.

32. There had been efforts to schedule the hearing before August 19, 1998, but as a result of the inability of counsel for the student to be available for a hearing prior to that date, the hearing could not be scheduled until August 19, 1998.

33. The School Board offered to continue testimony the evening of August 19, 1998, but rescheduled as a result of the request of the parents.

34. The Board offered to continue the hearing the next day (Thursday, August 20, 1998), however, [Student's] father was unavailable that day and requested another date.

35. The Board scheduled the hearing for August 26, 1998 over [Parents'] objection that their son could not be available that date because he would not be available again until Thanksgiving 1998.

(Findings of Fact Nos. 1–35)

Accordingly, based upon its findings, the School District concluded that 1) Student's statement "Why Should [Mrs. Fulmer] die? ... give me $20 to help pay for the hitman" constituted a threat to a teacher and was perceived by Mrs. Fulmer and others as a threat, 2) the statements regarding Mr. Kartsotis and Mrs. Fulmer constituted harassment of a teacher and principal, 3) the statements constituted disrespect to a teacher and principal resulting in actual harm to the health, safety and welfare of the school community, 4) the School District Code of Conduct prohibited such student conduct and 5), the statements caused actual physical harm to Mrs. Fulmer, as well other students and teachers. Consequently, the School District voted to permanently expel Student from its schools.

■ Appellants appealed the School District's determination to the trial court, which affirmed. On appeal to this Court, Appellants maintain that Student's constitutional rights were violated, the School District committed errors of law and, the School District's findings of fact are not supported by substantial evidence.[5] For the reasons that follow, we dismiss Appellants' arguments.

■ The law is clear in Pennsylvania that local school boards have broad discretion in determining school disciplinary policies. *Hamilton v. Unionville–Chadds Ford Sch. Dist.*, 552 Pa. 245, 714 A.2d 1012 (1998). Therefore, when one attacks a school board action on matters committed by law to its discretion, he has a heavy burden, as the courts are not prone to interfere unless it is apparent that the school board's actions are arbitrary, capricious, and prejudicial to the public interest. *Commonwealth v. Hall*, 309 Pa.Super. 407, 455 A.2d 674 (1983). In the absence of gross abuse of discretion, the courts will not second-guess policies of the school board. *Id.*

---

5. On review of a local agency determination, we are limited to determining whether constitutional rights were violated, whether an error of law or violation of agency procedure was committed, or whether the necessary findings of fact are supported by substantial evidence. *Kish v. Annville–Cleona Sch. Dist.*, 165 Pa.Cmwlth. 336, 645 A.2d 361 (1994).

The School District is empowered under Section 510 of the Public School Code of 1949 (School Code) [6] to adopt and enforce such reasonable rules and regulations as it may deem necessary and proper regarding the management of its schools and the conduct and deportment of all pupils attending the public schools within its district. In addition, Section 1318 of the School Code [7] provides that the school board may, after a proper hearing, permanently expel a student.

Section 12.6 of the Department of Education's regulations (regulations), 22 Pa. Code § 12.6, requires that the school board define and publish the types of offenses that will lead to exclusion from school and indicates that exclusion from school may take the form of suspension or expulsion. All expulsions require a formal hearing pursuant to Section 12.8 of the regulations. 22 Pa.Code § 12.6(b)(2).

## I. Whether the School District violated Student's constitutional rights.

### a. First Amendment-freedom of speech

In *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the United States Supreme Court affirmed a public school student's right to freedom of speech. In *Tinker*, as part of a plan formulated by a group of adults and students, several students wore black armbands to school in order to protest the United States' involvement in Vietnam, despite knowledge that such action was in violation of school policy. The students were asked to remove the armbands, and when they refused, were suspended until they came to school without the armbands. The students returned to school only after the planned period for wearing the armbands expired.

The students thereafter filed a complaint in the District Court for the South-ern District of Iowa seeking to enjoin the school district from disciplining them. The District Court dismissed the complaint, concluding that the school's policy against armbands was reasonable in order to prevent disturbance of school discipline. The United States Court of Appeals for the Eighth Circuit affirmed without opinion.

On appeal, the Supreme Court acknowledged that the wearing of armbands for the purpose of expressing different viewpoints is the type of symbolic act that is within the protection of the First Amendment. The Court stated that

> First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.

*Id.* at 506, 89 S.Ct. 733.

■ On the other hand, the *Tinker* Court emphasized the need for upholding the comprehensive authority of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in schools. The Court further recognized, however, that, in our system of government, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508, 89 S.Ct. 733. Thus, the Court concluded that in order for school officials "to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509, 89 S.Ct. 733. Therefore, conduct or expression of opinion, by the student, in class or out of it, that materially disrupts class work or involves substantial disorder

---

**6.** Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. § 5–510.

**7.** 24 P.S. § 13–1318.

or invasion of the rights of others, is not immunized by the First Amendment. *Id.* at 513, 89 S.Ct. 733.

In the *Tinker* case, the Court found no evidence that the school authorities had reason to anticipate that the wearing of armbands would substantially interfere with the work of the school or impinge upon the rights of other students. Rather, the Court determined that the action of the school authorities seemed to be based upon an urgent wish to avoid the controversy that might have resulted from the silent expression. Accordingly, the Court reversed the order of the District Court, reinstated the complaint and remanded the matter for further proceedings.

■ Verbal expression or "pure speech," as opposed to symbolic speech, must likewise materially disrupt class work or interfere with other individuals' rights in order to be denied First Amendment protection. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (Court upheld student disciplinary action where the student delivered a speech nominating a fellow student for student government that contained sexual metaphors, concluding that the nomination speech had a disruptive effect on the education process and that the school had an interest in protecting students from lewd and indecent language in a school-sponsored setting); *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367 (9th Cir.1996), (threats made to a guidance counsel by student were not protected by First Amendment). While it is undisputed that such speech is not protected by the First Amendment while *on* school grounds, the matter presently before us involves speech that occurred *off of school premises* and was communicated to others via the Internet. Not surprisingly, there is little case law addressing such an issue.

In regard to whether a student may be disciplined for conduct occurring off of school premises, our attention has been directed to several cases. In *Donovan v. Ritchie*, 68 F.3d 14 (1st Cir.1995), the United States Court of Appeals for the First Circuit addressed the issue of whether a student was denied due process where he was suspended for three days and prohibited from participating in school social events and interscholastic athletics.

On a Sunday evening, Donovan, along with several others, had compiled a "shit list" of other students that crudely described the other students' character, behavior, appearance or social conduct. The list, and copies of it, found their way to the school and were discovered in a trash barrel by a faculty member.

The school principal announced to the student body that the list was harmful and degrading and urged students to provide information as to the creators of the list. Donovan initially denied any involvement, but later admitted that he had photocopied the list. He further stated that since the photocopies were not reproduced at school, he was not subject to school discipline. The school principal disagreed and, after compiling a list of other students that were involved in the creation of the list, suspended Donovan for ten days. The suspension was based upon Donovan's violation of the school handbook.

Although the Court's opinion primarily addressed Donovan's due process arguments, the First Circuit stated that it was entirely satisfied with the District Court's determination that the off-premises conduct led to the distribution of the list on school premises and that therefore, the school did not violate Massachusetts law prohibiting suspension of a student for conduct that was not connected with any school-sponsored activities.

Similarly, in *Fenton v. Stear*, 423 F.Supp. 767 (W.D.Pa.1976), the Western District Court of Pennsylvania dismissed a student's claims that he was denied his civil rights when he was suspended for three days based upon conduct that occurred off of the school grounds. On a Sunday evening, Fenton was in the parking lot of a shopping mall with some

friends. As one of his teachers passed by, Fenton said, "He's a prick" loud enough for the teacher to overhear him.

The following Monday morning, the teacher reported Fenton's comment to the school principal, who informed the vice-principal. The vice-principal suspended Fenton for a period of three days.[8] At the request of Fenton's parents, the matter was discussed at a school board meeting. The suspension was upheld.

Thereafter, Fenton's parents received a notice that a meeting was to be held and that, possibly, there could be an additional suspension of ten days imposed. After the meeting, Fenton was placed on a complete "school restriction" for the remainder of the school year (eleven days). Fenton then sued the teacher and school authorities for a violation of his civil rights.

The District Court disagreed with Fenton that his First Amendment rights were violated. The Court stated that Fenton's conduct involved a violation of the right of the teacher to be free from being loudly insulted in a public place by lewd, lascivious or indecent words or language. The Court reiterated that the First Amendment does not protect "fighting" words—those that by their very utterance inflict injury or tend to incite an immediate breach of the peace. Rather, the District Court noted that "[s]peech that includes fighting words, the lewd and obscene, the profane and libelous, is not safeguarded by the Constitution." *Id.* at 771.

Addressing Fenton's argument that he could not be subject to discipline because the incident occurred on a Sunday evening in a public parking lot, the Court, disagreeing with Fenton, stated that:

> [i]t is our opinion that when a high school student refers to a high school teacher in a public place on a Sunday by a lewd and obscene name in such a loud voice that the teacher and others hear the insult it may be deemed a matter for discipline in the discretion of the school authorities. To countenance such student conduct even in a public place without imposing sanctions could lead to devastating consequences in the school.

*Id.* at 772.

In addition, the District Court concluded that Fenton received all the due process that he was entitled to receive. Thus, Fenton's complaint was dismissed.

And finally, in *Beussink By and Through Beussink v. Woodland R–IV Sch. Dist.*, 30 F.Supp.2d 1175 (E.D.Mo.1998), the United States District Court for the Eastern District of Missouri was presented with the issue of whether a student could be disciplined for speech that appeared on the Internet in a web-site created by the student. Beussink created a web-site that was highly critical of the school administration, the teachers, the principal and the school's web-site.

Beussink created the web-site at home and testified that he never intended that it be accessed at school. At his home, Beussink allowed a fellow student to view the site. The fellow student later had a fight with Beussink and in retaliation, accessed the web-site while at school and showed it to her computer teacher. At the time that the teacher viewed the web-site, only one other student was in the room. Of course, the teacher informed the school principal of the web-site.[9]

The principal decided to discipline Beussink because of the web-site and issued a disciplinary notice suspending Beussink for five days. Later the same day, the principal reconsidered the suspension and decided to increase the suspension to ten

---

**8.** Fenton served a three-day in-school suspension. He was required to attend school but was separated from other students.

**9.** Other students eventually viewed the web-site while at school. However, as the District Court noted, there was no clear indication of whether the student himself accessed the web-site for others or whether other teachers and students accessed it themselves.

days. Testimony established that delivery of the notices was the only disruption to classes that day. Beussink removed the web-site immediately upon returning home that day. Beussink served the ten-day suspension.

The school district had a policy in place whereby a student's grades would be dropped by one letter grade for each unexcused absence in excess of ten days. Suspension days were considered unexcused absences. Because Beussink had prior absences, the imposition of the absenteeism policy would cause him to fail all of his classes.

Beussink filed a request for a preliminary injunction, seeking to enjoin the school district from applying the absenteeism policy to him. In determining that Beussink had met his burden of proof for a preliminary injunction, the Court recognized that although students do not shed their First Amendment rights at the schoolhouse gate, the law is equally clear that the student's right to free speech is not without limitation. The Court then went on to determine that the evidence presented did not establish that Beussink was disciplined because of fear of disruption or interference with school discipline but rather, was disciplined because the principal was upset by the content of the web-site. The Court thus concluded that the web-site did not materially and substantially interfere with school discipline.

■ Thus, from the cases noted above, it is evident that the courts have allowed school officials to discipline students for conduct occurring off of school premises where it is established that the conduct materially and substantially interferes with the educational process.[10] Appellants maintain that presently, there was no interference with the educational process since the only disruption that occurred was when Mr. Kartsotis informed the faculty that there was a problem and did not disclose the nature of it. Thus, Appellants maintain that Mr. Kartsotis' actions caused speculation and rumor and that any such disturbance did not result from the web-site itself. We disagree.

In its well-written opinion, the trial court concluded that there was ample evidence upon which the School District could determine that Student's web-site hindered the educational process. Most damaging is the effect that the web-site had on Mrs. Fulmer. Although Appellants believe that Student's conduct was merely hyperbole, the School District could properly conclude that a reasonable person could be both physically and emotionally disturbed after viewing a web-site that contained a picture of her severed head dripping with blood, a picture of her face morphing into Adolph Hitler, and a solicitation, whether serious or otherwise, for funds to cover the cost of a hit man.

After viewing the web-site, Mrs. Fulmer was unable to complete the academic year and eventually took a medical leave of absence for the following school year. Her testimony demonstrated that she suffered, and continues to suffer, both physically and emotionally as a result of Student's actions. Moreover, Student's statements regarding the reasons he believes that Mr. Kartsotis and Mrs. Fulmer should be fired have a negative effect other students' perception of them.[11] Indeed, the reproduced record contains evidence establishing that other students were invited to, and did, interject their own derogatory comments into the web-site.

---

10. Indeed, this Court has previously upheld a school board's decision to expel a student where the student agreed to sell marijuana to another student while on school premises but the actual transfer of the marijuana and money occurred off of school grounds. *See Giles v. Brookville Area Sch. Dist.,* 669 A.2d 1079 (Pa.Cmwlth.1995).

11. The web-site counter indicated that it was viewed approximately 234 times. While we agree that the number 234 may not be an accurate number of *students* that viewed the site, it is clearly evident that the vast majority of hits came from other students. The faculty learned of the web-site only a week before Student took it down.

As the United States Supreme Court noted in *Fraser*

[t]he process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order. Consciously or otherwise, teachers—and indeed older students—demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class. Inescapably, like parents, they are role models. The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot by conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by this confused boy.

*Fraser*, 478 U.S. at 683, 106 S.Ct. 3159.

Regrettably, in this day and age where school violence is becoming more commonplace, school officials are justified in taking very seriously threats against faculty and other students. We emphatically reject Appellants' attempt to dismiss the reactions of the targetted faculty members as merely subjective. Given the contents of Student's web-site and the effect it had upon Mr. Kartsotis, Mrs. Fulmer and the school community, we conclude that the trial court properly determined that the School District did not violate Student's rights under the First Amendment.

### b. Fifth, Sixth and Fourteenth Amendments

The Department of Education's regulations provide that certain due process requirements are to be observed with regard to formal hearings. They include:

(i) Notification of the charges shall be sent to the student's parents or guardian by certified mail.

(ii) Sufficient notice of the time and place of the hearing must be given.

(iii) The hearing shall be held in private unless the student or parent requests a public hearing.

(iv) The student has the right to be represented by counsel.

(v) The student has the right to be presented with the names of witnesses against the student, and copies of statements and affidavits of those witnesses.

(vi) The student has the right to request that any such witnesses appear in person and answer questions or be cross-examined.

(vii) The student has the right to testify and present witnesses on his own behalf.

(viii) A record must be kept of the hearing, either by a stenographer or by tape recorder. The student is entitled, at the student's expense, to a copy of the transcript.

(ix) The proceeding must be held with all reasonable speed.

22 Pa.Code § 12.8(b)(1)(i–ix).

Appellants complain that Student was denied the right to full discovery, the right to have counsel of his choice present at the hearing and the right to a continuance until such time as Student could be present to confront the witnesses against him. We make short shrift of these arguments.

Under the regulations, Student was entitled only to receive copies of the list of witnesses against him and any statements made by those witnesses. There is no allegation that he did not receive these items if they were available. No other discovery is afforded a student in expulsion hearings.

Student was indeed afforded the right to counsel and was represented at the expulsion hearings. Appellants maintain, however, that Student was denied the right to counsel inasmuch as the School District refused to grant a continuance so that Student could obtain *additional* counsel that was more experienced in First Amendment issues. We conclude that where Appellants affirmatively represent-

ed that they were represented by counsel, the School District was under no legal obligation to delay its hearings so that Appellants could "counsel-shop."

■ In addition, the School District did not deny Student the right to face the witnesses against him. Student attended the August 19, 1998 expulsion hearing. It is obvious from the reproduced record that the hearing ran rather late into the evening. The School District offered to continue the hearing until the next evening; however, Student's father, for unexplained reasons, was unavailable.

The next meeting date available was August 26, 1998, a week later. Student did not attend the hearing because his Parents chose to enroll him in another school prior to the expulsion hearings. Appellants contend that the expulsion hearing should have been postponed until Student was available to attend, which would have been Student's Thanksgiving break. As the trial court noted, there is no right to a three-month continuance, especially given the fact that all of the School District's witnesses against Student were subject to cross-examination by counsel.

Interesting, Appellants' argument that the School District erred in refusing to grant a continuance is seemingly inconsistent with its argument that the School District denied Student's right to a speedy hearing. Appellants complain that Mr. Kartsotis learned of the web-site in May of 1998, but that no action was taken against Student until August. However, the School District accepted Mr. Kartsotis' explanation that no school action was taken against Student until the local authorities and the FBI completed their investigations.

Mr. Kartsotis could not anticipate whether Student would be otherwise held accountable for his actions until the authorities completed their investigations. Accountability through another forum might have influenced the School District's decision of whether to seek expulsion.[12] In our view, the School District proceeded cautiously and took the more prudent course of action by not pursuing the matter until all the facts became available to it. Moreover, Appellants did not demonstrate that they suffered any prejudice as a result of the minimal delay in the proceedings. Indeed, Appellants were provided with ample opportunity to defend against the action and formulate a response, which included enrolling Student in another school district.

Appellants further contend that the School District violated Student's rights under the Fourteenth Amendment which requires equal protection of the law be afforded to all. We likewise find this argument to be without merit.

■ The Equal Protection Clause guarantees that like persons in like circumstances will be treated similarly. *Curtis v. Kline*, 542 Pa. 249, 666 A.2d 265 (1995). It does not require, however, that all persons under all circumstances enjoy identical protection under the law. *Id.* The Commonwealth may classify individuals for the purpose of receiving different treatment and need not provide equal treatment among those with differing needs. *Id.*

■ The types of classifications recognized by the courts include (1) classifications that implicate a "suspect" class or fundamental right; (2) classifications implicating an "important", though not fundamental right, or a "sensitive" classification; and (3) classifications that involve none of these. *Id.*

■ Generally, the freedom of speech is a fundamental right. As such,

---

12. Appellants also complain that the decision to expel Student during the summer of 1998 violated the School District's policy of clearing a student's disciplinary record after the eighth grade before entering junior high school. While the School District may have such a policy in place, it would seem that the policy would only apply to those disciplinary proceedings that were resolved prior to the end of the school year.

any limitation placed upon it is to be strictly construed in light of a compelling governmental interest. However, speech that is lewd, obscene, profane, libelous and insulting is not constitutionally protected. *Commonwealth v. Baker*, 722 A.2d 718 (Pa.Super.1998). Thus, in order to prohibit such speech, there must be a rational basis for prohibiting it. *Curtis.* Here, we agree with the trial court's determination that the contents of Student's web-site do not constitute constitutionally protected speech and are, therefore, subject to the rational basis test.

In applying the rationale basis test, we must determine whether the challenged prohibition of speech seeks to promote any legitimate state interest or public value and if so, whether the classification is reasonably related to accomplishing that articulated interest. *Id.* Here, the trial court properly concluded that the School District's policy against harassment and threats to students and teachers alike serves the legitimate purpose of ensuring safe schools that promote a learning environment.

As the Supreme Court noted in *Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549, schools must teach by example the shared values of a civilized society and the conduct that is appropriate thereto. It is not socially acceptable to threaten or harass those that are charged with educating our youth. The School District's policy advances this standard of conduct.

We also agree that the School District's disciplinary action was tailored to address the governmental interest. Student's web-site materially disrupted the learning environment. Mr. Kartsotis was embarrassed by Student's allegations and Mrs. Fulmer felt threatened. Other teachers and students viewed the web-site while on school property and, therefore, were aware of Student's disdain for school officials. Students discussed the web-site while at

school and at school-sponsored activities. Thus, we agree with the trial court's determination that the School District's policy furthers a legitimate government interest.[13]

Accordingly, based upon the foregoing, we conclude that the trial court was correct in its determination that Student's constitutional rights were not violated.

## II. Whether the School District committed errors of law.

Appellants contend that the School District committed errors of law when it concluded that Student's statements constituted harassment and threats to a teacher, Student's disclaimer at the beginning of the web-site was ineffective and, Student had no privacy right in the web-site. We reject Appellants' arguments.

The School District's Code of Conduct provides that Level III infractions include disrespect and threats/harassment. Disrespect is defined as "[w]illful behavior which without reasonable cause is designed to lessen the reputation, honor, or public opinion of any individual." Appellant's brief at page 33. Threats/harassment is defined as "[w]illful behavior specifically intended to trouble, worry, or torment another individual for no beneficial purpose. This includes but is not limited to expressions of an intention to injure or harm an individual." *Id.* at 33–34.

Appellants contend that the School District erred when it concluded that Student's statements met these definitions and punished Student for off-campus activity. To reiterate, courts recognize the authority of school officials to discipline students for off-campus activity where that activity materially and substantially interferes with the education process. *Beussink; Donovan; Fenton.* In addition, it is

---

**13.** Appellants further contend that Student was treated differently from other students who were also investigated. The record is *de*

*hors* of any evidence upon which we could conclude that other students were involved in the present situation or others like it.

incredulous that Appellants believe that Student's representations regarding Mrs. Fulmer were not disrespectful. Student morphed her likeness into one of Adolph Hitler, called her a "fat bitch," and showed a picture of her severed head dripping with blood. Student also accused Mr. Kartsotis of engaging in an extra-marital affair. Student solicited money for a hit man, and whether or not it was mere hyperbole, he crossed that line of conduct that we, as a society, find acceptable.

It is of no significance that the local authorities and the FBI chose not to pursue the matter. Further, we find it irrelevant that the School District's definition of harassment differs substantially from that found in the Pennsylvania Crimes Code [14] and that the respective burdens of proof differ significantly between the two proceedings. The School District has defined "harassment" and communicated its definition to the student body.

 In addition, Student's disclaimer on the web-site has no legal effect. Disclaimer is defined as "a renunciation of one's legal right or claim; a repudiation of another's legal right or claim." BLACK'S LAW DICTIONARY 476 (7th ed.1999). The disclaimer does not create a contract between Student and the viewer and does not create any rights thereunder that could be renounced. Furthermore, the disclaimer does not limit access to the site nor does it inform the viewer of its offensive nature.

 And finally, the School District did not violate Student's right to privacy when it accessed the web-site. The explosion of technology that we call the World Wide Web allows individuals to access almost any information available to man. Web addresses and links provide us with the ability to access other sites that did not originally satisfy the terms of our searches and the ability to retrieve more information that we ever thought possible.

Instantly, Student's web-site was not a protected site, meaning that only certain viewers could access the site by use of a known password. As such, any user who happened upon the correct search terms could have stumbled upon Student's web-site. For example, a search of the terms "Bethlehem Area School District" may have found Student's site in its results.

In *United States v. Charbonneau*, 979 F.Supp. 1177 (S.D.Ohio 1997), the Southern District Court of Ohio determined that an individual did not possess an expectation of privacy of e-mail transmitted over the Internet. The Court likened e-mail messages to a letter. The sender can reasonably expect that the contents of the letter remain private until the time that the recipient receives it. Once received, the sender can no longer control the letter's destiny and, therefore, cannot be afforded a reasonable expectation of privacy.

Likewise, the creator of a web-site controls the site until such time as it is posted on the Internet. Once it is posted, the creator loses control of the web-site's destiny and it may be accessed by anyone on the Internet. Without protecting the web-site, the creator takes the risk of other individuals accessing it once it is posted. Accordingly, we conclude that the trial court was correct in its determination that Student maintained no expectation of privacy in the web-site.[15]

---

14. The Crimes Code provides that a person commits the offense of harassment when, with intent to harass, annoy or alarm another, he strikes, shoves, or otherwise subjects the victim to physical contact; follows a person in or about a public place; or engages in a course of conduct or repeatedly commits acts that alarm or seriously annoy another and that serve no legitimate purpose. Section 2709 of the Crimes Code, 18 Pa.C.S. § 2709.

15. Appellants also argue that Student did not have notice of the Level III offenses leading to his expulsion. We find this argument to be without merit. The School District issued a letter to Student and Parents on August 5, 1998, indicating those offenses that were charged against Student and the possibility of expulsion resulting therefrom.

### III. Whether the School Board's decision to expel Student is supported by substantial evidence.

Appellants maintain that the record is devoid of any evidence establishing that Student's actions caused actual physical harm to the health, safety and welfare of the school community. Without restating the previous analysis, we need only comment that Mr. Kartsotis and Mrs. Fulmer fully testified to their mental and physical reactions to the web-site. Mr. Kartsotis further testified as to the effects of the web-site on the school community as a whole. The School District found the testimony of Mr. Kartsotis and Mrs. Fulmer to be credible. Credibility determinations are within the sole province of the school board and may not be reviewed by this Court on appeal. *Barhight v. Bd. of Dir. of Bradford Area Sch. Dist.*, 689 A.2d 327 (Pa.Cmwlth.1997). Our review of this matter convinces us that the record supports the School District's findings of fact.

Because we conclude that the School District's determination did not violate Student's constitutional rights, did not contain errors of law and was supported by evidence of record, we affirm the trial court's order upholding the School District's August 31, 1998 decision expelling Student from its schools.

### *O R D E R*

AND NOW, this 14th day of July, 2000, it is hereby ordered that the July 23, 1999 order of the Court of Common Pleas of Northampton County is AFFIRMED.

FRIEDMAN, Judge, dissenting.

I respectfully dissent. The majority concludes that the web site created by J.S. (Student) did not have First Amendment

protection because Mrs. Fulmer reasonably perceived it as a threat, suffering physically and emotionally from it and being unable to continue teaching.[1] (Majority op. at 421–22.) However, the record shows that the Bethlehem Area School District (School District) did not perceive Student's web site as a "true threat." *See Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (stating that only "true threats" fall outside the protection of the First Amendment). Moreover, I believe that the proper test for determining whether Student's web site constitutes a "true threat" is whether a reasonable person in Student's position would foresee that viewers of the web site would interpret it as a serious expression of intent to harm. *See Lovell By and Through Lovell v. Poway Unified School District*, 90 F.3d 367 (9th Cir.1996). Because the School District did not perceive Student's web site as a threat and because a reasonable eighth grader would *not* necessarily foresee that the web site, with its disclaimer, would be interpreted as a serious expression of intent to harm, I would reverse.

### I.

Although the majority concludes that Mrs. Fulmer reasonably perceived Student's web site as a threat, (majority op. at 421), the record shows clearly that, when the School District discovered the web site, the School District did not consider it to be a "true threat."

On May 12, 1998, after being informed by a teacher of the existence of the web site, the principal viewed the web site and notified the School District superintendent, the school's technology specialist and the computer network manager. (R.R. at

---

1. Because of Mrs. Fulmer's reaction, the majority concluded that the web site materially and substantially interfered with the educational process at the Bethlehem Area School District. (Majority op. at 421.) Although the content of the web site affected Mrs. Fulmer personally, there is no evidence that the web site "materially disrupt[ed] classwork or involve[d] substantial disorder" so as to place it outside the protections of the First Amendment. *See Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

279a–80a.) On that same day, Ms. Jill Moran, the school computer specialist, identified the owner of the web site as "juswid" and informed the principal of such. (R.R. at 439a–40a; Exhibit 2.) Also, the principal notified Mrs. Fulmer of the existence of the web site, (R.R. at 281a, 370a), and Mrs. Fulmer viewed the web site from her home that evening. (R.R. at 391a.) As soon as she saw the name "juswid" on the web site on that date, Mrs. Fulmer believed that Student was responsible for the site. (R.R. at 410a.) On May 13, 1998, the principal and his staff investigated the creation of the web site by questioning seventeen students, who consistently identified Student as the creator of the site. (R.R. at 241a, 243a, 320a.)

Thus, almost immediately, the School District knew that Student was responsible for the web site. Yet, the School District took no action to have Student remove the web site; Student, acting on his own volition, deleted the web site a few days later on May 16, 1998. (R.R. at 134a, 143a, 329a.) In addition, the School District never inquired of any students if they had sent Student any money for a "hit man," with Mrs. Fulmer as the target, and never asked Student if he had collected money from anyone. (R.R. at 260a.) Further, the School District took absolutely no action to suspend Student, or to sanction Student in any way, for the rest of the school year.[2] It is apparent that the School District did not think it was reasonable for anyone to take seriously the "hit man" portion of the web site.

The School District did not decide to charge Student with any offense until July of 1998, and it was not until August 5, 1998, that anyone from the School District notified Student's parents about the web site. (R.R. at 25a, 26a, 303a, 304a, 317a.) The School District did not even attempt to separate Student from the faculty or other students, or even to warn members of the faculty[3] or the parents of other students that Student might be unstable or a risk to the school community.[4] In fact, on May 16 and 17, 1998, the School District permitted Student to participate in a school-sponsored weekend band trip where he shared a room with another student. (R.R. at 281a.) The principal explained that he was not about to violate Student's due process "for not a good reason." (R.R. at 286a.) Certainly, then, the School District did not think there was "good reason" to consider Student a "true threat" to the school community.

The majority indicates that the School District took no action against Student until August because the School District turned the matter over to the local authorities and the FBI. (Majority op. at 423.) However, when the local authorities and the FBI completed their investigations, they decided *not* to initiate criminal proceedings against Student. The majority states that this decision not to prosecute

---

2. Compare *Emmett v. Kent School District No. 415*, 92 F.Supp.2d 1088 (W.D.Wash.2000), where the school district, upon learning of a student's creation of a web site posting mock "obituaries" of fellow students and which allowed visitors to the site to vote on who would "die" next, immediately placed the student on emergency expulsion. Following an investigation, the school modified the expulsion to a five-day suspension. The federal district court ruled that the student demonstrated a substantial likelihood of success on the merits that even the five-day suspension violated his First Amendment rights because the web site was entirely outside of the school's supervision or control and the school district did not show that the student, in posting the web site, intended to threaten anyone, did actually threaten anyone, or manifested any violent tendencies whatsoever. *Emmett*.

3. Although the principal warned the faculty that they should be cautious, the principal did not give the faculty any particulars as to how they should be cautious or of whom they should be cautious.

4. The School District did not refer Student for a psychological evaluation or ask Student's parents to have Student evaluated by a psychologist to determine whether Student might be a risk to the safety of others. (R.R. at 283a, 308a–10a.)

"is of no significance." (Majority op. at 425.) I disagree.

The School District obviously believed that Student might have committed a crime when it placed the matter in the hands of the local authorities and the FBI. When those entities decided to take no action against Student, the School District could no longer delegate, or abrogate, its own authority. Indeed, when the local authorities and the FBI decided not to prosecute Student, the School District expelled Student for violating the school's code of conduct. However, the School District did *not* have to wait for the local authorities and the FBI to complete their investigations before acting pursuant to the school's code of conduct. Because the School District could have acted and did not do so, the School District must not have perceived Student's web site as a "true threat."

## II.

In determining whether particular speech constitutes a "true threat," the test is "whether a reasonable person [in the speaker's position] would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *Lovell,* 90 F.3d at 372. Although the majority does not apply this test here, I believe it is necessary to do so.

Student, an eighth grader, did not intend to communicate the alleged threats to the School District's teachers or administrators. Indeed, before entering Student's web site, a visitor had to agree to a disclaimer which stated that the visitor was not a member of the School District's faculty or administration.[5] (*See* majority op. at 415.) Those who did visit the web site had the following reactions: "[M]akes me crack up every time I read it" and "Go here anytime you need a good laugh." [6] (R.R. at 117a.) There is no evidence that this audience was not the intended audience for Student's web site.[7] Thus, the intended recipients of the alleged threat did not consider it to be "a serious expression of intent to harm." *See Lovell.*[8]

In cases such as this, we must strike a delicate balance between recognition of the dangers that, unfortunately, exist in our schools today and the reality that children, no matter how sophisticated their knowledge may be, are nevertheless children, immature and naive. In doing so, we cannot ignore the particular circumstances presented by a specific case. If the School District here believed that any teacher, administrator or student was endangered by Student's action, the School District clearly shirked its responsibility by not suspending Student immediately, investigating the incident fully and requiring Stu-

---

**5.** The majority indicates that anyone could have accessed Student's web site and that anyone "could have stumbled upon" it. (Majority op. at 425–26.) However, Mrs. Fulmer would not have known about Student's web site if someone had not informed a teacher about it. It is obvious to me from the disclaimer that Student never intended for Mrs. Fulmer to view the web site and to be physically and emotionally harmed by it. I do not condone what Student did here, nor do I disagree with the School District informing Mrs. Fulmer of the web site, but it is important to note that it was the School District, not Student, who intended and, in fact, did, communicate the existence of the web site to Mrs. Fulmer.

**6.** This type of sick humor can be found in some of today's popular television programs, such as South Park.

**7.** We note that none of the seventeen students interviewed by the principal and his staff indicated that Student intended to harm anyone. (R.R. at 321a.)

**8.** In determining whether the alleged threat constituted a "true threat" it was incumbent upon the School District to consider the "entire factual context, including the surrounding events and the reaction of the listeners." *Lovell,* 90 F.3d at 372. Because I do not believe that Student's web site constituted a "true threat" under the circumstances here, I do not believe it could serve as the basis for Student's permanent expulsion.

dent's psychological evaluation before re-admission. Delegating the investigation to criminal prosecutors while permitting Student to remain on school premises, to interact with other students and faculty and to engage in school sponsored activities is inconsistent with the severe sanction subsequently imposed on Student. This is particularly true when, without any invitation on the part of the School District, Student removed the offending web site once he became aware of the disturbance caused as a result of its dissemination by school officials. Under these circumstances, I would conclude that the School District abused its discretion in deciding to expel Student permanently, and, accordingly, I would reverse.