USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 95-1421 CHRISTOPHER DONOVAN, ET AL., Plaintiffs, Appellants, v. JOHN M. RITCHIE, PRINCIPAL, WINCHESTER HIGH SCHOOL, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Reginald C. Lindsay, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Aldrich and Coffin, Senior Circuit Judges. _____________________ ____________________ Paul L. Kenny for appellant. _____________ Mary Joann Reedy for appellees. ________________ ____________________ October 24, 1995 ____________________ COFFIN, Senior Circuit Judge. This appeal requires us to _____________________ decide whether the procedural due process requirements of Goss v. ____ Lopez, 419 U.S. 565 (1975), applied to and, if so, were correctly _____ applied to a high school student before his suspension. Appellant, a senior at Winchester High School, brought suit under both federal and state statutes and constitutional provisions against the school principal, the superintendent of schools, and the school committee, seeking injunctive relief, compensatory and punitive damages, and attorney's fees and costs for his ten-day suspension from school and exclusion from various extracurricular activities.  At the conclusion of a five-day bench trial, in which the evidence and argument focused solely on whether appellant had been afforded procedural due process, the district court granted judgment as a matter of law for the school committee members and found that the process given appellant was adequate. Appellant appeals from these dispositions but has not furnished us with a transcript of the trial proceedings. We affirm. The case revolves about a nine-page document bearing, in large capital letters, the scatological title, "The Shit List." Apart from a cover page and a concluding page containing general remarks of a boorish nature, the document zeroed in on some 140 named students,1 each name being followed by one or more lines of  ____________________ 1 The district court referred to the list as containing "the first name and the first initial of the last name" of students. The list appearing in the record as an exhibit contains the initial of the given name and the full surname of each student. -2- crude descriptions of character and/or behavior. The freshmen, fewer than a dozen, were treated to insulting comments about their appearance or social conduct. But the sophomores and juniors, more than thirty in each group, and more than sixty seniors were characterized by epithets that were not merely insulting as to appearance, but suggestive, often explicitly so, of sexual capacity, proclivity, and promiscuity. The sequence of events leading to appellant's suspension is the following. On September 18, 1994, a Sunday, some fifteen students were gathered in the home of one of them when the list was created by someone still unknown. On Thursday appellant and two other boys made copies of the list and put them in a trash barrel. They were delivered to the school soon after. After it was discovered by a faculty member the next day, Principal Ritchie announced to the school that the list was harmful and degrading, and urged students to provide information as to the perpetrators. On the following Monday, September 26, appellant and two others came to Ritchie's office and denied any involvement. The next day they came back and said that they had photocopied the list but denied knowing the contents and that, since the photocopying was outside of school premises, they were not subject to school discipline. The principal disagreed and said that they would probably face suspension. Meanwhile, Principal Ritchie met with other students and compiled a list of fifteen students who were said to be present at the creation of -3- the list. On Thursday, September 29, a letter was sent to the fifteen, announcing a meeting the next day for them and their parents.  At the September 30 meeting, Principal Ritchie said that the list was a violation of the school's rules, as set forth in the school handbook, against harassment and obscenity. After the meeting, Ritchie met with appellant and his mother and said he was indefinitely suspended. He did not specify the length of the suspension, but said that information would soon be forthcoming. In a letter requested by the principal and received the following Monday, October 3, appellant wrote apologizing for this "bad mistake" and saying: My involvement in the list is such; I had the list copied with 2 other boys and we then proceeded to take the list put it in a trash bag and put it in the barrel at Gin [Ginn Field] where it was to be picked up. Two days later, Ritchie met with the school's "Crisis Team," consisting of twelve staff members, and then wrote appellant's mother, specifying "the consequences for your son, Christopher's participation in the chain of events leading up to the distribution of the 'Shit List' at Winchester High School." They were suspension for ten days, and exclusion from any school social events and interscholastic athletics.  Principal Ritchie identified the following parts of the Student Handbook as being violated: (1) the cover, which called for an end to name calling, harassment, "put downs;" (2) an opening statement proscribing "harassment of any kind;" (3) a section proscribing violent behavior, vandalism, or violation of -4- students' civil rights on school premises or at school-related events, carrying the sanction of indefinite suspension or expulsion; and (4) a section barring abusive or obscene language or materials. Possible reinstatement to athletic programs (in appellant's case, lacrosse) and removal of the letter from appellant's file was to depend on steps "to repair the damage" to individuals and the school. In a subsequent, undated letter to the principal, appellant complained of his "excessive punishment" and added to his prior statement that he thought "it was the Underground Newspaper." Appeals to the superintendent and later to the school committee, in which presentations were made by both appellant's attorney and the principal, were unsuccessful. Discussion __________ We must first face a threshold question: whether the sanction imposed on appellant was an expulsion or a ten-day suspension. Appellant's brief assumes throughout that it was the former, citing the fact that Principal Ritchie initially told appellant and his mother than he was indefinitely suspended. Appellant then cites Jones v. Fitchburg, 211 Mass. 66, 68, 97 _____ _________ N.E. 612, 613 (1912), for the proposition that a suspension, "intended to operate[] for an indefinite period, . . . in effect amount[s] to a permanent exclusion. . . ." Accordingly, he invokes the authorities that specify a considerable panoply of rights, including the assistance of counsel and the right to -5- examine witnesses at a hearing. See, e.g., Dixon v. Alabama ___ ___ _____ _______ State Bd. of Educ., 294 F.2d 150, 159 (5th Cir. 1961). __________________ Unfortunately for appellant, the mere repetition of the expulsion label is of no avail. As the district court found, Principal Ritchie, after informing appellant and his mother that he was indefinitely suspended, told them that they would receive the information as to the length of the suspension in the mail "shortly thereafter." Five days later, after conferring with the "Crisis Team," he sent his letter of October 5, containing the details of the ten-day suspension. Appellant cannot attack the basis of the district court's finding that he was suspended, for he has not furnished us with a transcript. Real v. Hogan, 828 ____ _____ F.2d 58, 60 (1st Cir. 1987) ("If [the existing record] proves inconclusive, it is the appellant who must bear the brunt of an insufficient record on appeal.") In any event, however, we would be unlikely to find "clear error" in the finding. Cf. Roland M. __ _________ v. Concord School Committee, 910 F.2d 983, 990 (1st Cir. 1990). ________________________ We are, therefore, dealing with the kind of temporary suspension at issue in Goss v. Lopez. In that case the Court ____ _____ succinctly summarized the three procedural prerequisites: "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581. The Court added, "In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has -6- occurred." Id. at 582. In order for the student "to explain his ___ version of the facts at this discussion, [he should] first be told what he is accused of doing and what the basis of the accusation is." Id. "Requiring that there be at least an ___ informal give-and-take between student and disciplinarian," the Court concluded, would at least give the student "the opportunity to characterize his conduct and put it in what he deems the proper context." Id. at 584. ___ It is clear, first of all, that appellant had adequate notice. The principal warned him several days before the suspension took effect that the conduct he had acknowledged likely would result in his suspension. The principal's letter of October 5, elaborating on and specifying the bases for the suspension, referred to the High School Handbook, which every student was obliged to read and understand. Its cover, as the letter noted, briefly but clearly identified name-calling, harassment, and "put downs" as actions to be resisted. The principal also referred to the "Opening Remarks" of the Handbook, prohibiting "harassment of any kind." This introductory section defined "harassment" as "conduct, behavior, or comments that are personally offensive, degrading, or threatening to others," and gave such examples as "sexually suggestive remarks, . . . and the display or circulation of written materials . . . that are degrading to any individual. . . ." Thirdly, the principal cited to a regulation barring fighting, violent behavior, or "violation of other students' -7- civil rights" on school premises, the violation of which called for an indefinite suspension and possibly expulsion. Appellant challenges the relevance of this regulation to the facts of his case. He also argues that more formal procedures regarding notice, counsel, and presentation of witnesses are required under this regulation. This would seem to be true but it is obvious from the sanction imposed, a temporary suspension, that this regulation was not a ground for decision. The principal's fourth basis for punishment was regulations barring the use of either obscene materials or language that was "abusive," "obscene," "profane," or "vulgar."  Apart from the attack noted above to the third ground listed by the principal, appellant makes only two arguments. The first is that a passage in "Opening Remarks" urges sensitivity to the feelings of others and prompt communication between a student who feels aggrieved and an offender so that objectionable behavior may be brought to an end quickly. To read this as preempting any more severe treatment of what has been "strictly prohibited" is not only to treat the Opening Remarks section as internally inconsistent but also to ignore other parts of the Handbook detailing a twelve point "Range of Consequences" for violations of the student disciplinary code that extend from verbal warning to expulsion. Appellant's second thrust is against the charges of abusive or obscene language. His brief makes the assertion that "Notwithstanding that Ritchie found no evidence to support the foregoing, Ritchie cites this regulation without ever -8- explaining to Donovan how it was violated." This, in the light of "The Shit List" itself, defies rational justification even in the context of strenuous advocacy.  By the same token, there can be no rational question raised as to the basis for the suspension. Indeed, appellant knew precisely what the basis was -- the preparation and distribution of the list; he acknowledged his part in making photocopies and merely asserts that he did not know the contents. This leads us to the third requirement of Goss v. Lopez, an opportunity for the ____ _____ student to have presented his version of the facts. We conclude from the record that appellant had, and took advantage of, multiple opportunities to present his view of what occurred. On September 26, he and two others met with Principal Ritchie and denied any involvement. On September 27, they had another meeting and admitted photocopying, but no knowledge of contents. They also advanced their defense that their act did not take place on school property. On September 30, appellant and his mother met separately with Principal Ritchie, after a larger meeting, and had the opportunity to add to what had been said. We add these observations. At no time has appellant indicated the presence of any evidence other than his own say-so that could shed light on his defense of ignorance of contents. Moreover, as we reflect on the giant-sized capital letters spelling out the title of the list on the cover, and the following listing names with, generally, a salacious one-line -9- commentary, we can be skeptical of the likelihood of one remaining oblivious to content after feeding into and retrieving from the copying machine multiple copies of this nine-page document. Given the nature of the defense, the nature of the evidence, the lack of any trial transcript, and the opportunities given appellant to explain and support his position, we conclude that the disciplinarian was entitled to make a credibility judgment. We take note of an argument briefly advanced by appellant -- that, because of the bar to interscholastic athletics and other school activities, in addition to a ten-day suspension, the punishment falls outside of Goss and required a higher level of ____ procedural formalities. We are not unmindful of the impact of sanctions other than suspension and expulsion. As the Court in Goss recognized, there may be "unusual situations, although ____ involving only a short suspension, [where] something more than the rudimentary procedures will be required." 419 U.S. at 584. But the mere fact that other sanctions are added to a short suspension does not trigger a requirement for a more formal set of procedures. In Goss itself one of the plaintiffs had not only ____ been suspended, but had been transferred to another school. Id. ___ at 569 n.4. What must remain the focus is whether the student was given the opportunity to present his version of what occurred. In this case appellant has never suggested any respect in which he was denied this opportunity. -10- We add one final word. We have said that appellant bears any risk stemming from an inadequate record. Our reading of appellees' Proposed Findings of Facts below suggests that the absence of a record may have deprived us of evidence that is more adverse than helpful to appellant. In any event, on this record we conclude that he received all of the process that was due. We make short shrift of two other arguments. One is that Mass. Gen. L. ch. 71, 84 prohibits the suspension of a student for "marriage, pregnancy, parenthood or for conduct which is not connected with any school-sponsored activities. . . ." While the context suggests that the statute is dealing with matters other than actions taken with and aimed toward other students, we are entirely satisfied with the district court's reasoning that appellant's "admitted off-premises conduct led to the distribution of the list on school premises." As for appellant's objection to the judgment dismissing the claim against the members of the school committee, our due process holding renders further statement unnecessary. We do not, however, deem this such a frivolous appeal as to grant appellees' motion for attorney's fees. AFFIRMED. ________ -11-