Joanne KILLION, parent and natural guardian of Zachariah Paul, a minor, Plaintiff,

v.

FRANKLIN REGIONAL SCHOOL DISTRICT, Franklin Regional Board of School Directors, Betty Buford, Russell Porter, Deborah Good, Marie Byatt, Larry Newman, Michael Gigliotti, Reberta Cook, W.H. Milligan, Lee Reick, as Superintendent of Franklin Regional School District, Richard Plutto, as principal of Franklin Regional High School, Thomas Graham, as assistant principal of Franklin Regional High School, and Robert Bozzuto, Athletic Director of Franklin Regional High School, Defendants.

No. CIV. A. 99–731.

United States District Court, W.D. Pennsylvania.

March 22, 2001.

Witold J. Walczak, ACLU Foundation of PA, Pittsburgh, PA, for plaintiff.

John W. Smart, Andrews & Price, Pittsburgh, PA, for defendants.

## OPINION

ZIEGLER, District Judge.

Pending before the court are the parties' cross-motions for summary judgment, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Plaintiffs, Zachariah Paul (a minor) and Joanne Killion (Paul's parent and natural guardian), commenced this Section 1983 civil action alleging violations of the First and Fourteenth Amendments, and due process violations. For the following reasons, plaintiffs' motion for "partial summary judgment" will be granted, and defendants' motion for summary judgment will be denied.

## I. FACTS

The facts are not in dispute and can be summarized as follows. Plaintiff, Zachariah Paul ("Paul"), was a student at Franklin Regional High School during the 1998–1999 school year. During March of 1999, Paul, apparently angered by a denial of a student parking permit and the imposition of various rules and regulations for members of the track team (Paul was a member), compiled a "Top Ten" list about the athletic director, Robert Bozzuto. The Bozzuto list contained, *inter alia,* statements regarding Bozzuto's appearance, including the size of his genitals.[1] After consulting with friends, Paul composed and assembled the list while at home after school hours. Thereafter, in late March or early April, Paul e-mailed the list to friends from his home computer. However, Paul did not print or copy the list to bring it on school premises because, after copying and distributing similar lists in the past, he had been warned that he would be punished if he brought another list to school.

Several weeks later, several individuals found copies of the Bozzuto Top Ten list in the Franklin Regional High School teach-

---

1. The list reads as follows:

10) The School Store doesn't sell twink[i]es.

9) He is constantly tripping over his own chins.

8) The girls at the 900 #'s keep hanging up on him.

7) For him, becoming Franklin's "Athletic Director" was considered "moving up in the world".

6) He has to use a pencil to type and make phone calls because his fingers are unable to hit only one key at a time.

5) As stated in previous list, he's just not getting any.

4) He is no longer allowed in any "All You Can Eat" restaurants.

3) He has constant flashbacks of when he was in high school and the athletes used to pick on him, instead of him picking on the athletes.

2) Because of his extensive gut factor, the "man" hasn't seen his own penis in over a decade.

1) Even it is wasn't for his gut, it would still take a magnifying glass and extensive searching to find it.

J.A. 436.

ers' lounge and the Franklin Regional Middle School. An undisclosed student had reformatted Paul's original e-mail and distributed the document on school grounds.

On or about May 3, 1999, Paul was called to a meeting with Richard Plutto (principal), Thomas Graham (assistant principal), and Robert Bozzuto (athletic director). Upon questioning, Paul admitted that he had created the contents of the Top Ten list, and that he had e-mailed it to the home computers of several friends from his home computer; however, Paul steadfastly denied bringing the list on school grounds. Plutto or Graham instructed Paul to bring a copy of the original e-mail message the next day. Paul agreed and was allowed to return to his class.

The next day, shortly before Paul was scheduled to leave for a track meet, Plutto called Paul to his office. Paul, apparently anticipating that he might be disciplined, called his mother, who arrived shortly thereafter. Paul and Mrs. Killion went to the administrative offices where they met with Graham and Bozzuto. Graham and Bozzutto showed Mrs. Killion the Top Ten list, asked if she had seen it, and informed her that Paul was being suspended for ten days because the list contained offensive remarks about a school official, was found on school grounds, and that Paul admitted creating the list. Graham further informed Mrs. Killion that Paul could not participate in any school-related activities, including track and field events during the ten-day suspension. The next day, plaintiffs received a certified letter from Plutto advising them of the ten-day suspension for "verbal/written abuse of a staff member."

On or about May 10, 1999, plaintiffs commenced an action in the Westmoreland County Court of Common Pleas, Pennsylvania, against the School District seeking immediate reinstatement. The parties subsequently entered a settlement agreement wherein plaintiffs agreed to withdraw the complaint in exchange for the School District's agreement to provide Paul with the due process outlined in the Pennsylvania School Code. That evening, at about 10:15 p.m., plaintiffs' counsel received a faxed letter notifying plaintiffs of a suspension hearing the following morning at 9:00 a.m.

On May 12, plaintiffs, Plutto and Graham met for the suspension hearing, which resulted in a ten day suspension. The same day, plaintiffs commenced a civil action in this court seeking a preliminary injunction for First and Fourteenth Amendment violations, and requesting that Paul be allowed to return to school immediately. The parties entered into a consent order which allowed Paul to return to school. The parties have filed cross-motions for summary judgment.

## II. STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the party seeking summary judgment has demonstrated the absence of a genuine issue of material fact, its opponent must do more than simply show that there is some "metaphysical doubt" as to the material facts. In other words, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, in considering a motion for summary judgment, the court must examine the evidence in the light most favorable to the nonmoving party and draw all reasonable

inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

Plaintiffs seek summary judgment contending that defendants violated Paul's First Amendment right of free expression by suspending Paul for speech that was made off school grounds and in the privacy of his home. Plaintiffs further seek a declaration that the school policy at issue is unconstitutionally vague and overbroad because, "[a]bsent a definition of abuse, the policy is capable of unlimited, and unrestricted, number of unconstitutional applications." Pls.' Br. Supp. Mot. Partial Summ. J. at 31. Finally, plaintiffs argue that defendants violated Paul's procedural due process rights as guaranteed by the Pennsylvania School Code.

Defendants seek summary judgment contending that, pursuant to Supreme Court precedent, Paul was properly suspended for violating school policy. Further, defendants argue that qualified immunity protects the administrators because, "[i]n May of 1999, there was no clearly established law that a public school student could not be suspended for the publication and dissemination of a patently offensive, lewd and vulgar e-mail message about a school official, and distributed on school property which had the potential of disrupting school administration." Defs.' Br. Supp. Mot. Summ. J. at 12.

As an initial matter, we note that the parties entered into a consent agreement whereby plaintiffs agreed to dismiss the claims against defendants Plutto, Graham, Bozzuto and Reick in exchange for the District's agreement to "be responsible, as a municipal government entity, for the payment of any and all damages that may be awarded to the plaintiffs as a result of

the actions of" these defendants. Pls. Mem. Opp'n Defs.' Mot. Summ. J. at 2. According to plaintiffs, this agreement moots any claims or arguments with respect to qualified immunity and municipal liability. Pls.' Mem. Opp'n Defs.' Mot. Summ. J. at 2. As the parties have resolved these issues, we turn to consider the motions for summary judgment with respect to the asserted Due Process and First Amendment claims.

### A. Due Process Violation

Plaintiffs contend that the District violated Paul's rights to procedural due process as provided in 22 Pa.Code §§ 12.6 and 12.8. Section 12.6 provides, in relevant part:

(b) Exclusion from school may take the form of suspension or expulsion.

(1) Suspension is exclusion from school for a period of from 1 to 10 consecutive school days.

. . . . .

(ii) No student shall be suspended until the student has been informed of the reasons for the suspension and given an opportunity to respond. Prior notice of the intended suspension need not be given when it is clear that the health, safety or welfare of the school community is threatened.

(iii) The parents and the superintendent of the district shall be notified immediately in writing when the student is suspended.

(iv) When the suspension exceeds 3 school days, the student and parent shall be given the opportunity for an informal hearing consistent with the requirements set forth in § 12.8(c) (relating to hearings).

22 Pa.Code § 12.6.

Section 12.8(c) provides:

(c) The purpose of the informal hearing is to enable the student to meet with the

appropriate school official to explain the circumstances surrounding the event for which the student is being suspended or to show why the student should not be suspended.

(1) The informal hearing is meant to encourage the student's parents or guardian to meet with the principal to discuss ways by which future offenses can be avoided.

(2) The following due process requirements are to be observed in regard to the informal hearing:

(i) Notification of the reasons for the suspension shall be given in writing to the parents or guardian and to the student.

(ii) Sufficient notice of the time and place of the informal hearing shall be given.

(iii) A student has the right to question any witnesses present at the hearing.

(iv) A student has the right to speak and produce witnesses on his own behalf.

(v) The district shall offer to hold the informal hearing within the first 5 days of the suspension.

22 Pa.Code § 12.8.

According to plaintiffs, defendants violated Paul's due process rights in the following manner:

> [by failing to] giv[e] written notice to Zachariah or his mother prior to the May 4 meeting.... Plaintiffs did not receive any written communication from defendants until the day after the ten-day suspension had been imposed, and then only because Mrs. Killion insisted on such notice. The deficient notice further translated into a due process violation because plaintiffs did not have an opportunity to prepare for the hearing, including the right to summon and cross examine witnesses.

Pls.' Mem. Supp. Mot. Partial Summ. J. at 33–34. Plaintiffs also assert a second due process violation because defendants failed to give plaintiffs more than 12 hours written notice of the charges prior to the May 12 hearing. Thus, the argument continues, defendants have committed a two-fold violation of plaintiffs' state procedural due process rights.

■ Although defendants have failed to address plaintiffs' due process claim, we find that defendants' act of suspending Paul on May 4 without providing written notice to Paul or his parents prior to the suspension violated Paul's due process rights as set forth in 22 Pa.Code §§ 12.6, 12.8. Courts construing sections 12.6 and 12.8 have held that a school must give written notification of the reasons for the suspension before the informal hearing occurs. *See, e.g., Mullane v. Wyalusing Area Sch. Dist.*, 30 D & C 4th 179, 183 (Pa.Com.Pl.1996); *Mifflin County Sch. Dist. v. Stewart*, 94 Pa.Cmwlth. 313, 503 A.2d 1012, 1014 (1986).

Here, it is undisputed that defendants failed to provide written notification of the suspension and the reasons for the suspension prior to the informal hearing. Indeed, it was not until Mrs. Killion's mid-hearing request for a letter detailing the reasons for the suspension that defendants attempted to comply with the writing requirement of Sections 12.6 and 12.8. Given the lack of written notification prior to the suspension, we find that defendants violated Paul's due process rights as set forth in the Pennsylvania School Code.

■ We do not reach the same conclusion regarding the second hearing and suspension. Plaintiffs allege a due process violation occurred because, "[e]ven after the state court order, defendants gave plaintiff less than 12 hours written notice of the charges prior to the May 12 hearing." Pls.' Mem. Supp. Mot. Partial Summ. J. at 34. Plaintiffs rely on *Mifflin County School District v. Stewart*, 94 Pa.

Cmwlth. 313, 503 A.2d 1012 (1986), *Mullane v. Wyalusing Area School District*, 30 D & C 4th 179 (Pa.Com.Pl.1996), and *Minnicks v. McKeesport Area School District*, 74 D & C 2d 744 (Pa.Com.Pl.1975). However, these cases are inapposite.

The *Minnicks'* court found that "24 hours is inadequate notice of a disciplinary hearing **prior to 'expulsion.'**" *Minnicks*, 74 D. & C.2d at 753. As Paul was not expelled, *Minnicks* is inapplicable. In *Stewart*, the school district failed to provide any written notification of suspension, and in *Mullane*, unlike the pending action, the district failed to provide written notification **before** taking any action.

Here, however, defendants provided written notice to plaintiffs the night before the second informal hearing. Moreover, the notification informed plaintiffs of the violations that Paul had committed, and provided, in relevant part:

> The hearing will take place in the Conference Room of the Franklin Regional Senior High School before Mr. Richard E. Plutto, Principal of the Franklin Regional Senior High School, or his designee. **This is the date and time agreed upon by your counsel, Mr. Charles Conway, at the hearing before Judge Loughren on May 11, 1999.**

J.A. 117 (emphasis added).

Under the circumstances, given that defendants supplied written notification of possible suspension, plaintiffs' knowledge of the charges for which Paul was to be suspended, and plaintiffs' **prior agreement** to the date and time of the hearing, we fail to see how plaintiffs can seriously argue a second due process violation. Although we find that the second hearing comported with due process, plaintiffs' motion for summary judgment will be granted because the May 4 suspension, which issued without prior written notification, violated Paul's due process rights.

## B. First Amendment

### 1. Freedom of Speech

The Supreme Court has decided several cases establishing the framework within which to evaluate the First Amendment claims of public school students, which we will review. In *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), which arose during the heated context of the Vietnam War, the Court established that a public school building was not off-limits to free speech rights. According to the Court, "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506, 89 S.Ct. 733. In recognizing student expressive rights, the Court imposed a significant burden on the school to justify punishment of speech by demonstrating "that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.'" *Id.* at 509, 89 S.Ct. 733 (citation omitted). Since there was little evidence on which school authorities could have based a forecast of disruption, or evidence that the students' behavior had created any actual disruption in the school, the Court held that the school had not satisfied its burden. According to the Court, it was not constitutionally adequate for the school to rely on "undifferentiated fear or apprehension of disturbance." *Id.* at 508, 89 S.Ct. 733. Instead, the school needed evidence that such disruption had occurred or was likely to occur.

Several years later in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), the Court revisited the issue. In *Fraser*, the plaintiff, a high school student, was disciplined for a speech nominating a classmate for student government. The speech was

delivered at an official high school assembly in front of six hundred students, ages fourteen to eighteen, and included deliberate sexual innuendo which provoked a wide range of reactions from audience members, including yelling, mimicry, bewilderment and embarrassment. The next day, the plaintiff was informed that he had violated a school disciplinary rule that prohibited the use of obscene or profane language or gestures which materially and substantially interfered with the educational process.

Departing from the student autonomy emphasized in *Tinker,* the Court stressed that the purpose of public education was to " 'prepare pupils for citizenship in the Republic.... It must inculcate the habits and manners of civility.' " *Id.* at 681, 106 S.Ct. 3159 (citations omitted). According to the Court, civility required that "[e]ven the most heated political discourse in a democratic society requires consideration for the personal sensibilities of the other participants and audiences." *Id.* at 681, 106 S.Ct. 3159. Moreover, in qualifying its holding in *Tinker* that students do not lose their constitutional rights at the schoolhouse gate, the Court stressed that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Id.* at 682, 106 S.Ct. 3159. One of the distinctions between adults and children stressed by the Court was the legitimacy of protecting minors from exposure to vulgar language. These twin decisional rules, i.e., the validation of the school's role in teaching civilized behavior and the lesser First Amendment rights of minors, caused the Court to conclude that "schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct." *Id.* at 683, 106 S.Ct. 3159.

Finally, in *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Court upheld, against First Amendment challenge, a principal's deletion of student articles on teen pregnancy from a school-sponsored newspaper. Distinguishing *Tinker,* the Court noted that the school had not opened the newspaper as a public forum and therefore could "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities as long as [its] actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. 562.

■ These decisions reveal that, under *Fraser,* a school may categorically prohibit lewd, vulgar or profane language on school property. Under *Hazelwood,* a school may regulate schools—sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern. "Speech falling outside of these categories is subject to *Tinker's* general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others." *Saxe v. State Coll. Area Sch. Dist.,* 240 F.3d 200, 214 (3d Cir.2001) (citations omitted).

Each of the Supreme Court decisions in this area have considered the regulation of speech that occurs on school grounds. Plaintiffs argue that the relevant speech occurred off school grounds, within the confines of Paul's home, and was subsequently printed and carried on school grounds by other persons. Thus, according to plaintiffs, defendants could not discipline Paul for the list absent exceptional circumstances. Defendants argue that Paul's suspension was appropriate because it was disruptive, lewd and obscene. We consider these arguments below.

### a. Substantial Disruption

Although there is limited case law on the issue, courts considering speech that occurs off school grounds have concluded (relying on Supreme Court decisions) that school officials' authority over off-campus expression is much more limited than expression on school grounds. For example, in *Emmett v. Kent School District No. 415,* 92 F.Supp.2d 1088 (W.D.Wa.2000), the district court considered the appropriateness of a student suspension for creating a web page on the Internet from his home without using school resources or time. In granting the temporary restraining order, the court noted that:

In the present case, Plaintiff's speech was not at a school assembly, as in *Fraser,* and was not in a schoolsponsored newspaper, as in *Kuhlmeier.* It was not produced in connection with any class or school project. Although the intended audience was undoubtedly connected to Kentlake High School, the speech was entirely outside of the school's supervision or control.... The defendant ... has presented no evidence that the mock obituaries and voting on this web site were intended to threaten anyone, did actually threaten anyone, or manifested any violent tendencies whatsoever. This lack of evidence, **combined with the above findings regarding the out-of-school nature of the speech,** indicates that the plaintiff has a substantial likelihood of success on the merits of his claim.

*Id.* at 1090 (emphasis added).

Similarly, in *Beussink v. Woodland R–IV School District,* 30 F.Supp.2d 1175 (E.D.Mo.1998), the court granted the plaintiff's motion for a preliminary injunction enjoining his suspension from school for creating a homepage on his home computer (off school hours), wherein the plaintiff criticized the school's administrators. Noting, *inter alia,* that the plaintiff's ho-

mepage did not materially and substantially interfere with school discipline, and absent any evidence to support a reasonable fear of interference, the court enjoined the school district from restricting the plaintiff's use of his home computer to repost the homepage. *Id.* at 1181–82.

Finally, in *J.S., a Minor v. Bethlehem Area School District,* 757 A.2d 412 (Pa. Cmwlth.2000), the court affirmed J.S.'s expulsion because J.S. created a web-site on his home computer titled "Teacher Sux." The web-site consisted of several pages that contained derogatory comments about J.S.'s algebra teacher and other administrators. After viewing a picture of her severed head dripping with blood, a picture of her face morphing into Adolph Hitler, and a solicitation (whether serious or otherwise) for funds to cover the cost of a hit man for the teacher's execution, the algebra teacher had to take a leave of absence. The court, noting that the case involved off-campus activity, applied the *Tinker* standard and found evidence of substantial disruption, and further noted that:

in this day and age where school violence is becoming more commonplace, school officials are justified in taking very seriously threats against faculty and other students.... Given the contents of Student's web-site and the effect it had upon Mr. Kartsotis, Mrs. Fulmer and the school community, we conclude that the trial court properly determined that the School District did not violate Student's rights under the First Amendment.

*Id.* at 422.

Courts have also applied the *Tinker* analysis where off–campus speech makes its way to the campus, even if by some other student. *See, e.g., Boucher v. School Bd. of the Sch. Dist. of Greenfield,* 134 F.3d 821 (7th Cir.1998); *Bystrom v. Frid-*

*ley High Sch.*, 686 F.Supp. 1387 (D.Minn. 1987), *aff'd*, 855 F.2d 855 (8th Cir.1988) (table decision); *Sullivan v. Houston Independent Sch. Dist.*, 475 F.2d 1071 (5th Cir.), *cert. denied*, 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973); *Beussink v. Woodland R–IV Sch. Dist.*, 30 F.Supp.2d 1175 (E.D.Mo.1998); *Baker v. Downey City Bd. of Educ.*, 307 F.Supp. 517 (C.D.Cal.1969); *Pangle v. Bend–Lapine Sch. Dist.*, 169 Or.App. 376, 10 P.3d 275 (2000).

◼ Although plaintiffs urge that a heightened standard applies because the speech at issue occurred off school grounds, we need not resolve this issue. The overwhelming weight of authority has analyzed student speech (whether on or off campus) in accordance with *Tinker*. Further, because the Bozzuto list was brought on campus, albeit by an unknown person, *Tinker* applies.

◼ Applying *Tinker* and its progeny, we find that Paul's suspension violates the First Amendment because defendants failed to satisfy *Tinker's* substantial disruption test. First, defendants failed to adduce any evidence of actual disruption. *See, e.g., Bystrom*, 686 F.Supp. at 1392 (substantial disruption established given classroom disruption after students read nonschool sponsored newspaper); *Baker v. Downey City Bd. of Educ.*, 307 F.Supp. 517 (C.D.Cal.1969) (substantial disruption established based on diminished control of students, disruption and interference with classroom study and teaching following distribution of off-campus newspaper); *see also Chalifoux v. New Caney Indep. Sch. Dist.*, 976 F.Supp. 659 (S.D.Tex.1997) (absent evidence of actual disruption, ban prohibiting Catholic student from wearing a rosary to school on the ground that some gangs had adopted the rosary as their identifying symbol violated the student's religiously-motivated speech). There is no evidence that teachers were incapable of

teaching or controlling their classes because of the Bozzuto Top Ten list. Indeed, the list was on school grounds for several days before the administration became aware of its existence, and at least one week passed before defendants took any action. J.A. 22.

Further, we note that the speech at issue was not threatening, and, although upsetting to Bozzuto, did not cause any faculty member to take a leave of absence, as in *J.S.* Although the intended audience was undoubtedly connected to Franklin Regional High School, the absence of threats or actual disruption lead us to conclude that Paul's suspension was improper. *See Emmett*, 92 F.Supp.2d at 1090.

◼ Admittedly, Bozzutto, Graham, Plutto and others found the list to be rude, abusive and demeaning. J.A. 26, 44. However, "[d]isliking or being upset by the content of a student's speech is not an acceptable justification for limiting student speech under *Tinker*." *Beussink*, 30 F.Supp.2d 1175, 1180 (E.D.Mo.1998). Indeed, "the mere desire to avoid 'discomfort' or 'unpleasantness' is not enough to justify restricting student speech under *Tinker*. However, if a school can point to a well–founded expectation of disruption—especially one based on past incidents arising out of similar speech—the restriction may pass constitutional muster." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d at 212.

Defendants attempt to support an expectation of disruption defense by arguing that Paul had created similar lists in the past, and had been warned that he would be punished for distributing similar lists in the future. However, defendants have not presented any evidence that Paul's earlier lists had caused disruption which would have supported a belief that substantial disruption would follow from the Bozzuto list. At best, defendants have offered evi-

dence that Bozzuto was upset and had a hard time doing his job, and that the librarian (the subject of the Book Nazi list) was almost in tears. J.A. 163–64. However, these events do not rise to the level of substantial disruption, and do not support an expectation of disruption defense.

Further, Paul was never disciplined for the earlier lists. Absent evidence establishing disruption flowing from the earlier lists, defendants have failed to establish there was substantial reason to anticipate a disruption. *See, e.g., West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366 (10th Cir.2000) (based on recent racial incidents and confrontations, school officials had reason to believe that display of confederate flag would cause disruption); *Boucher v. School Bd. of the Sch. Dist. of Greenfield*, 134 F.3d 821, 827 (7th Cir. 1998) (student's disclosure of ways to "hack" into school's computer system, which required four hours of computer expert testing, supported an inference of potential future disruption); *Pangle*, 10 P.3d at 286–87 (substantial disruption foreseeable based on student's description of specific methods for causing personal injury, property damage, and disruption of school activities); *see also Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524 (9th Cir.1992) (absent evidence that "scab" buttons were "inherently disruptive," students could proceed with First Amendment claim); *Beussink*, 30 F.Supp.2d at 1181–82 (absent disruption or reasonable fear of disruption, speech cannot be restricted).

Finally, defendants apparently argue that the Bozzuto list could "impair the administration's ability to appropriately discipline the students." Defs.' Br. Supp. Mot. Summ. J. at 11. We cannot accept, without more, that the childish and boorish antics of a minor could impair the administrators' abilities to discipline students and maintain control. *Accord Tinker*, 393 U.S. at 508, 89 S.Ct. 733 ("in our system, undif-ferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression"); *Klein*, 635 F.Supp. at 1442 ("The Court cannot accept, however heartfelt it may presently be, [that] the future course of the administration of discipline ... [will] dissolve, willy-nilly, in the face of the digital posturing of this splenetic, bad-mannered little boy.").

**b. Lewd, Vulgar or Profane Speech**

Our conclusion that no actual disruption or reasonable fear of disruption occurred does not end our inquiry. Defendants also argue that the suspension was appropriate because Paul's speech was lewd and obscene and therefore punishable under *Fraser*. Plaintiffs rejoin that, "[i]f the Bozzuto list could in fact be considered contraband, sanctionable under *Bethel*, the defendants['] recourse would be to punish those students who actually brought the offending material to school. But to punish the author for work created outside of school is certainly beyond the First Amendment pale." Pls.' Mem. Supp. Mot. Partial Summ. J. at 29–30 n. 16.

In *Fraser*, the Court made clear that school officials may punish explicit, indecent, or lewd speech "to make the point to pupils that such speech is wholly inconsistent with the 'fundamental values' of public education." 478 U.S. at 686–87, 106 S.Ct. 3159. However, in a concurring opinion, Justice Brennan noted that, "[i]f respondent had given the same speech **outside of the school environment, he could not have been penalized simply because government officials considered his language to be inappropriate[.]"** *Fraser*, 478 U.S. at 688, 106 S.Ct. 3159 (citing *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)) (emphasis added).

Likewise, courts considering lewd and obscene speech occurring off school

grounds have held that students cannot be punished for such speech, absent exceptional circumstances. In *Thomas v. Board of Education, Granville Central School District,* 607 F.2d 1043 (2d Cir.1979), the Court of Appeals held that the First Amendment rendered school officials powerless to discipline several students for publishing an off-campus newspaper specializing in sexual satire. In so holding the court stated that:

> When school officials are authorized only to punish speech on school property, the student is free to speak his mind when the school day ends. In this manner, the community is not deprived of the salutary effects of expression, and educational authorities are free to establish an academic environment in which the teaching and learning process can proceed free of disruption. Indeed, our willingness to grant school officials substantial autonomy within their academic domain rests in part on the confinement of that power within the metes and bounds of the school itself.

*Id.* at 1052. *But Cf. Baker v. Downey City Bd. of Educ.,* 307 F.Supp. 517 (C.D.Cal. 1969) (upholding student suspensions for the use of profanity and vulgarity appearing in off-campus newspaper distributed just outside main campus gate given several instances of classroom disruption after distribution of newspaper).

Similarly, in *Klein v. Smith,* 635 F.Supp. 1440 (D.Me.1986), the plaintiff was suspended from school for giving a teacher "the finger" after school hours and off school grounds. The student filed suit. In concluding that giving "the finger" constituted speech, *id.* at 1442 n. 3, and that the suspension violated the student's First Amendment rights, the court reasoned as follows:

> The conduct in question occurred in a restaurant parking lot, far removed from any school premises or facilities at a time when teacher Clark was not associated in any way with his duties as a teacher. The student was not engaged in any school activity or associated in any way with school premises or his role as a student....

Anyone would wish that responsible teachers could go about their lives in society without being subjected to Klein-like abuse. But the question becomes ultimately what should we be prepared to pay in terms of restriction of our freedom to obtain that particular security....

The First Amendment protection of freedom of expression may not be made a casualty of the effort to force-feed good manners to the ruffians among us.

*Id.* at 1441–42.

Here, defendants argue that Paul's top ten list contained several lewd and vulgar statements, namely: "As stated in previous list, he's just not getting any.... Because of his extensive gut factor, the 'man' hasn't seen his own penis in over a decade.... Even if it wasn't for his gut, it would still take a magnifying glass and extensive searching to find it." J.A. 436. Although we agree that several passages from the list are lewd, abusive, and derogatory, we cannot ignore the fact that the relevant speech, like that in *Klein* and *Thomas,* occurred within the confines of Paul's home, far removed from any school premises or facilities. Further, Paul was not engaged in any school activity or associated in any way with his role as a student when he compiled the Bozzuto Top Ten list.

Although defendants attempt to rely on *Donovan v. Ritchie,* 68 F.3d 14 (1st Cir. 1995), to support the contention that students may be punished for out of school speech, we find that *Donovan* is distinguishable because there the focus of the inquiry was on whether the suspended stu-

dent had received adequate procedural due process. In addition, unlike Paul, the suspended student admitted his involvement in copying (off campus) and transporting "The Shit List," which contained crude descriptions, insulting comments and epithets about 140 named students. Given the out of school creation of the list, absent evidence that Paul was responsible for bringing the list on school grounds, and absent disruption, as in *Baker*, we hold as in *Klein* and *Thomas*, that defendants could not, without violating the First Amendment, suspend Paul for the mere creation of the Bozzuto Top Ten list.[2] Plaintiffs' motion for summary judgment must be granted.

### 2. Overbreadth and Vagueness

We need not tarry long in addressing plaintiffs' final challenge, as defendants have failed to address the matter. Plaintiffs challenge the Franklin Regional School District's Retaliatory Policy arguing that the policy is unconstitutionally vague and overbroad. An overbroad statute is one that is designed to punish activities that are not constitutionally protected, but which prohibits protected activities as well. *See City of Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). Plaintiffs argue that the policy is overbroad because it could "encompass critical comments in the nature of whistle-blowing activities, e.g., criticism that a teacher is incompetent, allegations that a gym teacher improperly hit a student, or that a staff member sexually groped a student in a remote area of school." Pls.' Mem. Supp. Mot. Partial Summ. J. at 31. Further, "without limiting language that (1) confines the policy to school grounds and school-related activities and (2) re-

quires that offending speech create a 'substantial disruption,' the policy is overbroad." Pls.' Mem. Supp. Mot. Partial Summ. J. at 31.

Only a statute that is substantially overbroad may be invalidated on its face. *See City of Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). The Supreme Court has never held that a statute should be invalidated merely because it is possible to conceive of a single impermissible application. *Id.* Instead, in a facial challenge to overbreadth and vagueness of a law, a court must determine whether the enactment reaches a substantial amount of constitutionally protected conduct. *Id.* (citing *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)).

The policy at issue provides that "it must be clearly understood that if a student verbally or otherwise abuses a staff member, he or she will be immediately suspended from school. It may then be the recommendation of the administration to the Board of School Directors that they indefinitely suspend or expel the student involved." J.A. 105. The policy, however, does not contain a definition of "abuse" and fails to include any specificity or limitations.

Yet, in discerning the reach of the policy, we must consider any limiting constructions placed on the policy by defendants. *See Ward v. Rock Against Racism*, 491 U.S. 781, 795–96, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("Administrative interpretation and implementation of a regulation are ... highly relevant to" whether the regulation is overbroad). In this re-

---

**2.** Defendants' argument that Paul carried the list to school is not supported by the evidence of record. Indeed, the passages of Paul's testimony reveal his steadfast denial that he printed and carried the Bozzuto Top Ten List to school. Further, Paul stated that he took a list found in the hallway and showed it to his coaches. These statements, however, do not establish that Paul "brought" the list on school grounds.

gard, we note that defendants have failed to offer any limiting constructions that they have placed on the policy, such as factors not included in the policy that are routinely considered in determining whether a student has violated the policy.

Absent any indication by the school district as to how the policy has actually been applied, we conclude that the policy is overbroad because it could be interpreted (and indeed, was interpreted) to prohibit protected speech. Moreover, the policy "does not contain any geographical or contextual limitations; rather, it purports to cover [all "abuse" of teachers whether the "abuse"] ... occurs in a school sponsored assembly, in the classroom, in the hall between classes, or in a playground or athletic facility." *Saxe*, 240 F.3d at 216; *see also Shanley*, 462 F.2d at 976. Indeed, the policy could be read (and was read) to cover speech occurring without school premises. In addition, the policy is overbroad because it is not limited to speech that causes substantial disruption or interference with the work of the school, as required by *Tinker*. *See Saxe*, 240 F.3d at 216 (same). For these reasons, we conclude that the Retaliatory Policy is unconstitutionally overbroad. *Accord Shanley*, 462 F.2d at 976 (school policy was overbroad because it "sweeps protected activity wholly outside of the school context along with proscribed activity").

 Plaintiffs also argue that the Retaliatory Policy is void because it is unconstitutionally vague. Under the "void for vagueness doctrine," a governmental regulation may be declared void if it fails to give a person adequate warning that his conduct is prohibited or if it fails to set out adequate standards to prevent arbitrary and discriminatory enforcement. *See Chicago v. Morales*, 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999); *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

As with the overbreadth challenge, we conclude that the policy is unconstitutionally vague. We do not read plaintiffs' brief to argue that the policy was too vague for him to understand. Rather, plaintiffs apparently rely on the second prong, i.e., unrestricted delegation of power to school officials. Under the policy, school officials can only discipline students for "abuse" directed towards a teacher or administrator. However, to determine what constitutes "abuse," punishable under the policy, one must make a subjective reference. Admittedly, "some statements might be seen as universally ... [abusive; however], different people find different things abusive." *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1184 (6th Cir.1995). This leads to the danger that school officials will interpret the policy arbitrarily. *Id.* (facts of the case demonstrated the necessity of subjective reference in identifying prohibited speech under the policy). This unrestricted delegation of power gives rise to the second type of vagueness. *See Morales*, 527 U.S. at 60, 119 S.Ct. 1849.

The Supreme Court has held that, "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Fraser*, 478 U.S. at 686, 106 S.Ct. 3159. However, the Court did not hold that school rules could be devoid of any detail, as here. For the reasons discussed, we find that defendants' Retaliatory Policy is unconstitutionally overbroad and vague.

An appropriate order will follow.

### ORDER

AND NOW, this —— day of March, 2001, after consideration of the parties' cross-motions for summary judgment, pur-

suant to Rule 56(c) of the Federal Rules of Civil Procedure, and the written submissions,

IT IS ORDERED that the motion (doc. no. 27) of plaintiffs, Joanne Killion and Zachariah Paul, shall be and hereby is granted.

IT IS FURTHER ORDERED that the motion (doc. no. 31) of defendants shall be and hereby is denied.

IT IS FINALLY ORDERED that the court shall hold oral argument on, ——, 2001, at 10:00 a.m. with respect to money damages and counsel fees incurred by plaintiffs.